## *In re* GLEN IRON WORKS, Bankrupt.[1]

### (*Circuit Court, E. D. Pennsylvania.*   June 6, 1884.)

1. CORPORATIONS—INSOLVENCY—CAPITAL SUBSCRIPTIONS—LIABILITY OF STOCKHOLDERS—ATTACHMENT EXECUTION.

   Unpaid subscriptions to the capital stock of a corporation which has become insolvent, may be levied upon under writs of attachment execution, although no assessment has been made by the board of directors. *Bunn's Appeal,* 14 Wkly. Notes Cas. 193, distinguished.

2. SAME—SUBSCRIPTION NOTES—ASSESSMENTS AND CALLS.

   Where the articles of association of a corporation provided for a capital stock of $140,000, and stipulated that the stockholders should give their notes, without interest, for their respective subscriptions, which should not be liable at any time to an assessment for more than 50 per centum of their face, *held* that, in case of insolvency, the whole capital subscribed was liable to creditors; and the corporation having become bankrupt after 20 per centum of the capital had been assessed and paid in, *held,* that the stockholders were liable to attaching creditors for their respective proportions of the whole unpaid amount of the subscriptions.

3. SAME—BANKRUPTCY—LIEN OF PRIOR ATTACHMENTS.

   The corporation having been declared bankrupt, upon proceedings instituted subsequently to the service upon stockholders of such writs of attachment execution, and the unpaid capital having been awarded to and collected by the assignee in bankruptcy, without prejudice to the rights of the attaching creditors, and with leave to them to intervene, *held,* upon the intervention of such creditors, claiming the amounts of their judgments out of the fund in the hands of the assignee, that the same was liable to the lien of the attachments, and should be awarded to the attaching creditors.

4. BILL OF REVIEW—RIGHT OF ASSIGNEE TO BRING—REV. ST. § 4986.

   The assignee in bankruptcy is a proper party to bring a bill of review where the claim of attaching creditors is put forward as paramount to the rights of the assignee.

[1] Reported by Albert B. Guilbert, Esq., of the Philadelphia bar.

Bill of Review to the District Court, brought by E. P. Wilbur, assignee in bankruptcy of the Glen Iron Works, bankrupt. The facts are set forth in the report of the decision of the district court, 17 FED. REP. 324, and in the following opinion:

*W. D. Luckenbach, Furman Sheppard,* and *Geo. W. Biddle,* for petitioner.

*R. E. Wright, Jr., P. K. Erdman,* and *R. C. McMurtrie,* for claimants.

BRADLEY, Justice. This is a bill of review under the bankrupt law of 1867, brought by the assignee in bankruptcy of the Glen Iron Works to review the decision of the district court upon the claim of Charles W. Cooper and others as attachment execution creditors. Cooper and the other respondents obtained a judgment against the corporation of the Glen Iron Works in the court of common pleas of Lehigh county, in January term, 1871, for $25,000, on which an attachment execution was issued on the first of January, 1875, with a clause of *scire facias* against stockholders of the corporation holding stock therein, on which only 20 per centum had been paid, the object of the attachment being to garnishee the unpaid balance. The attachment was served upon the corporation and the garnishees on the second of January, 1875. On the third of March, 1875, a creditor's petition was filed in the district court of the United States to have the corporation declared bankrupt; it was adjudicated such on the thirtieth of March; and on the fifth of May, Wilbur, the assignee, who brings the present bill of review, was appointed assignee in bankruptcy. In November, 1875, the assignee brought suits at law in *assumpsit* in this court against the several stockholders of the corporation to recover the amount of their unpaid subscriptions to the stock, to-wit, the remaining 80 per cent. The suits were tried and disposed of upon affidavits of cause of action and affidavits of defense filed. It was alleged in the former that the corporation was insolvent, and in the affidavits of defense that there was no assessment, either by the board of directors of the corporation or by a court, and without such assessment there was no liability on the part of the defendants to pay the unpaid stock. The court held the defense good, and suggested that the proper mode of proceeding was by bill in equity against all the stockholders. The actions at law were thereupon discontinued, and a bill in equity was filed in the district court, which resulted in a decree that the stockholders should pay the whole amount of their unpaid subscriptions. One of the defenses set up by the stockholders in the equity suit was the service upon them of the attachment executions, which they allege their liability to pay, if they were liable at all, on their unpaid subscriptions. But the court, speaking by Judge CADWALLADER, (*Wilbur* v. *Stockholders,* 35 Leg. Int. 346,) decided that the attachment executions, which were prior to the commencement of the proceedings in bankruptcy, could not prevent the entering of the decree or its enforcement; but that the

decree would be made without prejudice to the rights (if any) of the respective attaching creditors; and that they might, if so advised, intervene for their own interests. This decree was affirmed by the circuit court on appeal the twenty-sixth of April, 1879, and the assignee collected the fund, or so much of it as was collectible. On the second of April, 1881, the attachment execution creditors, acting upon the suggestion of the court, intervened in their own behalf, presented before the register in bankruptcy proof of their judgment, their attachment execution, and the service thereof on the stockholders, and claimed that the said attachment should be paid out of the money recovered by the assignee. The register decided against the claim, holding that the debt arising upon the unpaid subscriptions was only due, under the contract of subscription, in case of an assessment, and no assessment having been made in January, 1875, when the attachment was served, there was nothing in the hands of the garnishees due the corporation, and nothing passed to the execution creditors. The register's report was made March 31, 1883. 17 FED. REP. 324. The district court overruled this decision of the register, allowed the claim of the attachment execution creditors, and referred the matter back to the register, with directions to make a new report in accordance with its opinion. This being done, and a decree in favor of the execution creditors being entered, the assignee brought the present bill of review to reverse that decree.

A preliminary question is raised as to the right of the assignee to bring the bill of review. On this question, however, we have but little difficulty. The section of the bankrupt law which gives to the circuit court power to review the decisions of the district court in matters of bankruptcy (Rev. St. § 4986) declares that "the circuit court for each district shall have a general superintendence and jurisdiction of all cases and questions arising in the district court for such district when sitting as a court of bankruptcy, * * * and, except when special provision is otherwise made, may, upon bill, petition, or other proper process of *any party aggrieved,* hear and determine the case as in a court of equity." It is contended that the assignee is not "a party aggrieved" within the meaning of the law; that it is a question of distribution of proceeds among the creditors, and that only creditors, namely, general creditors, opposed to the claim of priority on the part of the attachment creditors, are the parties aggrieved. But while the general creditors may be proper parties to file the bill, in our judgment, the assignee is also a proper party, for the reason that the claim of the attaching creditors is put forward as paramount to his rights, and as standing upon a superior title. The assignee represents the general estate of the bankrupt corporation; but the attaching creditors claim that they have a lien on portions of that estate, to which the interest of the assignee, as transferred to him from the corporation by operation of law, is subject. The assignee, in the interest of the general creditors, opposes

this lien, and claims to hold the estate free from it. And while we think, therefore, that he is a proper party to file the bill, it is certainly more convenient and less expensive for him to do it than for the creditors to do it, either jointly or separately. The terms of the act ought to be construed liberally in this regard, in order that the proceedings may not be befeated by technical objections as to parties, and that the interest and convenience of all may be subserved. If it be apprehended that the assignee might carry on litigation when the creditors were indisposed to do so, it is no more than might happen in reference to all the interests of the estate in his charge, and their wishes could at any time be made known to the court, and would undoubtedly be prevailing when expressed by those entitled to weight and importance in the administration of the estate.

Another matter proper to be disposed of before proceeding to consider the principal question in the case, is the point made by the assignee, that the attachment proceedings were waived by the issue of a *fi. fa.* and levying on and selling the real estate of the corporation pending the proceedings in bankruptcy. But we are satisfied that under the state law there is no objection to the suing out of contemporaneous executions. And so far as the bankrupt law is concerned, if a judgment creditor levies on a portion of the bankrupt estate on which his judgment is a prior lien, he may, perhaps, be enjoined from proceeding; but if no action is taken by the bankruptcy court we do not see how such a levy can affect a fixed lien which he has on other property, unless he makes his debt out of that levied on. In the present case, the real estate being incumbered to its full value, only a hundred dollars were realized by the sale, and neither the bankruptcy court, nor the assignee, nor the creditors, seem to have troubled themselves about the matter. We think there is nothing in the point.

The main ground of contention of the appellant's counsel is that the liability of the stockholders on their unpaid subscriptions of stock as it stood in January, 1875, when the attachment was issued, was not a debt due to the corporation, attachable under process of execution by the laws of Pennsylvania. The law under which it is claimed by the execution creditors that the subscription was attachable is the "act relating to executions," passed June 16, 1836, the thirty-fifth section of which declares that "in the case of a debt due to the defendant, or of a deposit of money made by him, etc., the same may be attached and levied in satisfaction of the judgment in the manner allowed in the case of a foreign attachment; and by the thirty-seventh section it is declared that "from and after service of the writ all debts and all deposits of money, and all other effects belonging or due to defendant by the person or corporation upon which service is made, shall remain attached in the hands of such corporation or person" as in foreign attachment.

The Glen Iron Works was incorporated under a charter granted by act of the legislature, approved March 16, 1865, which declared that

the capital stock of the company should be divided into shares of $50 each, and should consist of 1,000 shares, with power of increasing it to 3,000 shares. Under this act the subscribers, in July, 1870, entered into articles of association, by which they agreed to associate themselves together for the purpose of manufacturing iron, under a capital of $140,000, divided into 2,800 shares of $50 each, and to take the number of shares set opposite their respective names, giving their notes, without interest, for the full amount subscribed, but not liable to an assessment of more than 50 per cent. of the face thereof, and not liable to an assessment of more than 20 per cent. within 18 months after organization. The stock notes given were in the ordinary form of promissory notes, dated August 1, 1870, payable one day after date to the Glen Iron Works or order, without defalcation; and to each note was appended a memorandum that it was for the full amount of the party's subscription to the capital stock, and subject to assessments from time to time, as the board of directors might deem necessary, subject to the condition specified in the agreement as to the amount of assessments, and with a stipulation that dividends declared from profits should be credited upon the note until the note should be paid. It is this condition—that there should be no liability to pay the notes without assessment, and that the assessments should not exceed in the aggregate 50 per cent. of their face— upon which the assignee on behalf of the general creditors relies for the position that there was no attachable debt due to the corporation from the stockholders when the attachment execution was issued, inasmuch as no assessment had then been made of any part of the 80 per cent. still unpaid. A resolution for a call of 30 per cent. had been made, it is true, but had been repealed before the attachment issued; and the question is whether, in that condition of things, the liability on the subscription was attachable or not?

It is contended that there was no debt until an assessment was made, and, in proof of this, reference is made to the decision of this court in the actions at law brought by the assignee against the stockholders, to the effect that such actions would not lie in the absence of an assessment; and reference is also made, on the same point, to certain recent decisions of the supreme court of the United States, namely, *Scovill* v. *Thayer*, 105 U. S. 143, and *Patterson* v. *Lynde*, 106 U. S. 519; S. C. 1 Sup. Ct. Rep. 432. And, if it be true that no debt can be attached for which an action at law will not lie, either at the suit of the principal debtor or that of his assignee in bankruptcy, it follows, as a matter of course, that the liability of the stockholders, in this case, could not be attached in January, 1875. But this does not appear to be universally true, since it has been repeatedly decided by the Pennsylvania courts that the efficacy of attachment process is not confined to the garnishment of legal demands, but extends to those of an equitable nature as well. Property, assets, debts, and choses in action assigned by the principal debtor, in a manner

valid and binding as against himself, and so as to be only available to his creditors by an equitable proceeding, are nevertheless subject to an attachment execution, as where assignments or conveyances are made in fraud of creditors, or are void as against creditors for want of being recorded as required by law. Whatever is done in fraud of creditors, or calculated to hinder and delay them in recovering their debts, is not allowed to stand in their way. *Flanagin* v. *Wetherill*, 5 Whart. 280; *Stewart* v. *McMinn*, 5 Watts & S. 100; *Watson* v. *Bagaley*, 2 Jones, 164; *Driesbach* v. *Becker*, 10 Casey, 152; *French* v. *Breidelman*, 2 Grant, 319; *Robinett* v. *Donnelly*, 5 Phila. 361.

By the flexibility of Pennsylvania procedure, long deprived as it was of the forms of chancery pleading, whereby an expansive application of legal remedies to equitable rights became a necessity, it is possible that some of the cases embraced in the category referred to might have been amenable to some legal remedy, though, as between law and equity, properly speaking, they are all strictly of equitable cognizance. Thus, where the object was to reach goods fraudulently assigned and still in the hands of the assignee, that learned jurist, Judge HARE, in the case last cited, said:

"Although a conveyance in fraud of creditors, with intent to create a secret resulting estate or interest in the grantor, vests a title in the grantee which is, as between himself and the grantor, as absolute as if the transfer had been made in good faith, and for value, it will, notwithstanding, give rise to a trust in favor of the parties who are meant to be defrauded, which may be enforced in this state through the medium of an action at common law. So far as they are concerned, the trust will be viewed as express, and the trustee, if privy to the fraud, made answerable, as if the duty of holding the property for their benefit had been set forth on the face of the deed."

But a mere uncollected debt thus assigned could not certainly be reached by an action at common law, but only by a proceeding in equity, or an attachment.

So, generally, any debt owing to the principal debtor, but not yet due, cannot be made the subject of an action at common law, whether he has assigned it or not. It can only be reached by his creditors by a proceeding in equity, or by an attachment. That it may be reached in this manner is very clear from abundant authority.

It cannot be said, therefore, that the existence of a right to an action at law, for the collection of a claim, is the criterion for determining whether it is or is not attachable. There must be something more, something in the nature of the obligation itself, to put it outside of the reach of an attachment.

It is contended that such an impediment did exist in the case now under consideration; that at the time of issuing the attachment no debt existed; that the condition (namely, an assessment and a call) had not been performed to give it existence; and that those conditions could only be performed by the board of directors of the corporation, or by a court of chancery. But, if there was not a technical debt in existence, it must be conceded that there was an obligation

in existence, which only required the happening of certain contingencies to make it a technical debt. The word "debt," as used in the statute of 1836, is of very broad application, and embraces many obligations which, in strict speech, are not debts. This is shown by the cases already referred to, and by many others that might be cited. A contract to pay money at a future day is not strictly a debt until the day of payment arrives, although it is called *debitum in præsenti, solvendum in futuro*, and is undoubtedly attachable. When the condition is performed (which in this case is mere lapse of time) it will be a strict debt. So a promise to pay money on any other of many conditions that might be specified, comes within the same category. A contract to pay a builder so much money when a house which he has contracted to build is completed, is not a debt until the work is finished; yet, if it be partly completed, and requires little more to be done, as, for example, the painting, or the putting of locks on the doors, or weights on the windows, no one would say that such an obligation is not attachable, or that the condition may not be performed after the attachment had been laid, either by the builder himself, or by the party interested in the attachment. This would certainly be so in all cases, except where personal trust and confidence are reposed in the contractor, as in the painting of a picture, and where the performance of the condition by any other person would make a material difference to the other party to the contract.

Now, what was the condition to be performed in the present case in order to convert the obligation of the stockholder into a perfect and complete debt? Nominally, as between the stockholders themselves, or (which is the same thing) between them and the corporation, (which consisted of themselves,) the condition was that there should be an assessment by the board of directors, and a call, and this could not extend beyond 50 per cent. of the whole subscription. But everybody concedes that this condition need not be strictly and literally performed, and that, as to creditors who cannot otherwise be paid than by a resort to the stockholders, it is void, and does not require strict performance. As a whole, considering it in all its parts, it is an agreement calculated to hinder and delay creditors in the collection of their debts against the corporation; for, as to them, the whole subscribed capital of a corporation is a trust fund, (as is sometimes said,) but, at all events, it is a sacred fund, absolutely devoted by the law to the payment of all their just demands, notwithstanding any private agreements between the stockholders themselves. But when such an agreement is adopted in good faith, and without any real intent to defraud, equity will carry it out, or, at least, will pay regard to it so far as it can be done without injury to the creditors; and hence will not compel any stockholder to pay more than his proportionate share of what may be necessary to pay the creditors; and will, through the judicial machinery at its command, make such fair and equitable assessment as will produce, by its application to those

who are responsible and able to pay, all that is needed to pay all the debts of the corporation. This gives to the stockholders the substantial benefit of their mutual agreement, so far as it can be regarded at all. But this is not a strict performance of the condition. It is only paying such regard to the terms and effect of it as will secure to the stockholders the most essential benefits of it consistent with the claims of the creditors. It is a substituted performance which answers all the purposes of justice.

But this action of the court of chancery does not create the obligation to pay. It only ascertains the just amount to be paid by each stockholder. The obligation to pay is founded—*First*, on the subscription to the stock; *secondly*, upon the existence of creditors and debts of the corporation requiring the payment of the subscription to satisfy them. As to such creditors and the debts due to them, the condition is but a spider's web, which the first breath of the law blows away. Nevertheless, where the judicial constitution of the commonwealth or state provides a forum in which full and complete justice may be done to both creditors and stockholders, as is the case where a chancery jurisdiction is established, the equity courts will assume the administration of the estate, and will divide the burden among the several stockholders in accordance with the agreement which they have made between themselves. This is what is effected by the interposition of a court of chancery. It does not create the duty to pay, it only assesses the equitable amount to be paid by each. It would be too much to say that, in a state where no chancery procedure exists, the courts would be powerless to enforce the duty, although they might be unable to enforce it in a manner so convenient and complete. In the absence of any other method, they might, perhaps, leave it to the stockholders themselves to obtain just contribution from each other, thus throwing upon them the burden of enforcing an agreement made between themselves, which, strictly speaking, is void as against creditors.

From these considerations it is apparent that the obligation of the subscribing stockholder becomes a *debitum in præsenti* when the debts of the corporation cannot be paid without resort to the unpaid stock; but *solvendum in futuro*, that is, when the fair and equitable amount to be paid has been ascertained and liquidated. It becomes a debt when there are debts of the corporation to pay,—the law discountenances any contrary idea,—though the amount may be a matter of examination and adjustment. The courts of common law, not having at their command the requisite machinery to ascertain the amount in an ordinary action, will not entertain such an action at the suit of an assignee; especially is this so where another jurisdiction exists which has all the machinery for effecting complete justice between the parties. But this is a question of procedure, rather than a question of right, and ought not to affect the real and substantial rights of parties. We are aware that a different mode of speaking in rela-

tion to the subject has frequently been used,—a mode of speaking more in accordance with the view that an assessment and a call, to be made by a court, or some officer or agent of a court, (if not made by the directors themselves,) are necessary in order to create the debt as well as to ascertain its amount. But, looking at the matter in its essence and true reason, it seems to us that the substantial thing, in addition to the fact of subscription, is the existence of corporation debts, which cannot be paid without a resort to such subscription. It is this which overrides the condition on which the subscription is made, by bringing the case within the paramount edict of law, which nullifies all devices for hindering and defrauding creditors.

If we are right in this view of the subject, the question then arises whether a debt of this nature, before being liquidated by an account showing the proportionate amount due from each stockholder, though not in a situation to be recovered in a common action at law, may be attached on execution. The law gives the creditor a right by an attachment execution to reach the debts, property, and effects of his debtor, however skillfully covered up or concealed, and in whatever hands or condition they may be found. This is a substantial right, and is not to be thwarted unless insuperable difficulties in its attainment present themselves. We have seen that it is not confined to legal demands of the debtor, but extends to those of an equitable nature; that it extends to debts not due, as well as to debts that are past due; that it extends to demands not yet liquidated, as well as to those which are certain in amount.

And at this point it is pertinent to ask whether the attachment execution, and the proceedings which are proper to be had upon it, do not, in their nature, partake of an equitable character. Inquiries are instituted, interrogatories are propounded, and it is, at least, somewhat difficult to assign strictly the limits of the investigation and proceeding which may ensue under the direction of the court. Had not chancery powers been conferred upon the courts of Pennsylvania, can there be any doubt that this supplementary proceeding on execution would have been moulded to effect all the results in regard to the satisfaction of creditors which are conceded to be available in equity? Why is not the service of an attachment with *scire facias* as much of a call as is a formal order of a court of equity? And why may not the court from which the execution issues inquire, as well as a court of equity may, as to the percentage necessary to be paid by each stockholder to raise the amount of the judgment? At all events, if it should be shown, as in many cases there would be no difficulty in showing, that the whole subscription would be necessary, what would there be to hinder the establishment of such a fact? But if, after serving the attachment, it should be found necessary to resort to an equitable proceeding to ascertain the proportional amount which ought to be paid by each stockholder, this need not necessarily have the effect, and we see no reason why it should have the effect,

to dissolve the attachment, or to destroy the priority acquired by the attaching creditor. It would be an ancillary proceeding in aid of the attachment, and a proper mode of giving it full and complete effect.

The case of *Hays* v. *Lycoming Fire Ins. Co.*, lately before the supreme court of Pennsylvania on two different occasions, (2 Outerbridge, 184, and 3 Outerbridge, 621,) seems to us directly in point. That was the case of a mutual fire insurance company, in which the members gave notes for their premiums, assessable *pro rata* for the payment of any loss that might occur, and only payable as and to the extent thus assessed. This regulation was not the result of a mere argeement of the stockholders between themselves, but was expressly made in the charter of the company. By a supplement to the charter, the company was further authorized to issue policies for cash premiums to outside parties not becoming members, payable, in case of loss, by assessments on the premium notes of the members in the same way as other losses. A loss occurred on a cash policy, and, having been adjusted, the president of the company, by order of the directors, gave the insured an order on the treasurer for the amount. This order, not being paid, was sued on, judgment was recovered, and an attachment execution issued, with a *scire facias* directed to various members of the company who had given premium notes. The directors had levied an assessment on all notes in force on a certain day, to provide for the payment of losses and expenses up to that date, and another assessment on all notes in force on a subsequent day, to pay losses occurring between the two dates. These assessments were insufficient to pay more than 30 per cent. of the policies due, which amount was offered to the plaintiff and refused. The defense was that an attachment execution would not lie, because claims could only be paid by way of assessment, and the assessments levied were appropriable to those claims for which they were levied *pro rata*, and did not really belong to the company, which acted as a mere trustee; that prior assessments could not be attached to pay subsequent losses; and that subsequent assessments could not be attached, because moneys in the hands of the collectors are virtually in the hands of the company itself. This defense was sustained by the common pleas, but the supreme court reversed the judgment, holding that, as to cash policies, the company was virtually a stock company, and that its premium notes represented its capital stock, and that whenever, by an assessment regularly made, the whole, or any part, of such notes becomes due, there is such an indebtedness in favor of the company as may be attached by any of its creditors other than its own members. The case came before the court the second time on a different state of facts. In October, 1881, the insurance company was dissolved by a decree of the common pleas, and a receiver was appointed. He reported that the assets of the company (almost wholly premium notes) amounted to over $1,000,000, and that the liabilities (mostly losses by fire) amounted to over $360,-

000. The court thereupon directed the receiver to levy an additional assessment on premium notes, to meet these liabilities; which was done. The plaintiff, whose judgment still remained unsatisfied, filed supplemental interrogatories, and one of the garnishees admitted that the receiver's assessment on his note was $96, which he was willing to pay to whomsoever was entitled to it. The court of common pleas again decided adversely to the attachment, principally on the ground that the receiver, being an officer of the court of chancery, could not be made amenable to an attachment. But the supreme court again reversed the judgment. The court, by Mr. Justice TRUNKEY, said:

"The question now presented is whether assessments on the premium notes of the garnishee, made during the pendency of the attachment suit by the receiver of the company, are bound by the attachment. It can hardly be denied that, if so bound, the plaintiff is entitled to recover and collect the money from the garnishee. If, by virtue of the writ of attachment, he is entitled to the debt attached, neither the company defendant, if still in being, nor the receiver, if the company has been dissolved, can collect the money for him against his will. A receiver has no right to property of the defendant which was taken in execution before his appointment. This proceeding was pending at the time and before the civil death of the company. It is by no means the case of an execution, or an attachment, issued and levied after the appointment of the receiver."

The court then goes on to discuss the question thus presented, and the discussion is so apt to the case before us that we cannot do better than to quote its exact language. The learned justice proceeds to say:

"The garnishee gave his notes to the defendant, to be paid in such portions and at such times as the directors may, agreeably to the act of incorporation, require. The losses by fire occurred, and this judgment for one of said losses was obtained prior to the proceedings for the dissolution of the company. Before its dissolution the garnishee became indebted on his premium notes for the proportionate sum necessary for payment of said losses, and nothing remained to be done except to ascertain the proper amount of his indebtedness, prior to his liability to an action to enforce payment. The writ of attachment was issued and served before the dissolution of the company, and the debt owing to the defendant by the garnishee became bound by it. After the receiver was appointed by the court he ascertained the measure or amount of the debt which had been levied upon by the attachment of the plaintiff.

"A garnishee is liable for money belonging to the defendant in the attachment which is received by him after service of the writ. *Sheetz* v. *Hobensack*, 20 Pa. St. 412. When the defendant is a corporation, and has been dissolved, and a receiver appointed, the case would be different with respect to money so received after the dissolution. But if a debt was attached before the dissolution and appointment, though not due, it will be held as if due, the garnishee having the right to withhold payment till it becomes due; and if the debt was subject to a condition he may hold the money until the performance of the condition. In such cases an existing debt is attached, though not presently due, or some action is necessary to ascertain its amount."

As before said, we do not well see how a case could be more directly in point than this. The question now before us was directly in issue, and was the only material question in the case; and the decis-

ion appears to have had the unanimous assent of the court. If this decision correctly declared the law of Pennsylvania as it was in February, 1882, the time when it was pronounced, it was certainly the law which governed the rights of the parties in the case before us, for those rights accrued and became fixed prior to that date.

We are referred, however, to a recent decision of the supreme court of Pennsylvania, in the case of *Bunn's Appeal*, 14 Wkly. Notes Cas. 193, announced in January of the present year, which seems adverse to the views expressed in *Hays* v. *Lycoming Ins. Co.*, though it professes not to be so, but to be distinguishable therefrom. We have carefully examined the opinion in the case of *Bunn's Appeal*, and are unable to concur in that part of it which relates to the question under consideration. It was a question which did not necessarily arise in the case; for the jurisdiction of the court below, as a court of equity, clearly appeared from the other considerations which were so ably expounded by the supreme court; and the objection that one of the creditors might have had relief by an attachment execution could not have prevailed against the jurisdiction of equity which was much more adequate and complete, and was competent to the determination of the whole controversy between all the parties. And we are unable to see how the fact of the company's insolvency could distinguish the case from *Hays* v. *Lycoming Ins. Co.* Surely the substantial rights of an attachment creditor cannot depend upon the question whether the company is solvent or insolvent. The obligation of the stockholder is the same in either case, except as to mere amount, and if liable to be attached in the one case, it must be liable in the other. The lien acquired by the attaching creditor equally binds the debt, whatever may be the financial condition of the corporation. With all due respect for the distinguished court which rendered the decision in the case of *Bunn's Appeal*, we feel constrained to abide by its previous decision in *Hays* v. *Lycoming Ins. Co.*, not only because it better accords with our own views, but because it is declarative of the law of Pennsylvania as that law stood in the jurisprudence of the state when the rights of the parties before us were acquired.

The decree of the district court is affirmed, with costs.