## SCOVILL *v.* THAYER.

1. Certificates of stock of an incorporated company issued in excess of the limit imposed by its charter are void, and the holder of them is not entitled to the rights, nor subject to the liabilities, of a holder of authorized stock.

2. He is not estopped to set up the invalidity of such unauthorized stock as a defence to an action by creditors against him, to recover the balance unpaid thereon, by the fact that he attended the meeting at which it was voted to issue the same, or that he received and held certificates therefor, or that the officers and agents of the company represented its capital to be equal to the amount of both its authorized and unauthorized stock.

3. When the company which issued stock beyond such limit has been adjudicated bankrupt, the holder of the unauthorized stock is not entitled to have the money paid thereon applied as a credit on the unpaid balance due on his authorized stock.

4. Subscribers to the stock of an incorporated company paid twenty per cent on their shares, and entered into an agreement with the company that no further assessments should be made thereon, and certificates for full-paid shares were issued to them. The company was adjudicated a bankrupt, and to satisfy the claims of its creditors it became necessary to assess the unpaid stock. *Held,* 1. That the agreement was in equity void as to creditors. 2. That before an action at law can be maintained by the assignees in bankruptcy against a stockholder to recover upon his unpaid subscription of stock, some proceedings in the interest of creditors are necessary in a court of competent jurisdiction, to set aside the agreement, and to make an assessment upon such unpaid stock. 3. That until an order of such court to that effect, and an assessment, or some authorized demand upon the stockholder to pay the balance due on his stock, no cause of action accrues against him in favor of the assignees, and the limitation prescribed by the second section of the Bankrupt Act does not begin to run in his favor.

ERROR to the Circuit Court of the United States for the District of Massachusetts.

On Nov. 25, 1870, the Fort Scott Coal and Mining Company was organized as a corporate body under the General Laws of the State of Kansas, with a capital stock of $100,000.

According to the laws of that State, any corporation might increase its capital stock to any amount not exceeding double its authorized capital.

Under the provision of this law the corporation, on April 19, 1871, increased its capital stock from $100,000 to $200,000. On Oct. 16, 1872, the corporation attempted, by taking the steps required by law for the lawful increase of stock, to increase its capital stock to $300,000, and on Dec. 27, 1872, to

make a further increase of $100,000. The nominal capital was thus raised to the sum of $400,000.

Nathaniel Thayer, the defendant in error, who was a holder of shares in the company, attended by proxy the meetings of the stockholders at which the third and fourth issues of stock were voted. After this attempted increase of the stock, the officers and agents of the company, by advertisements, bill-heads, and verbally, represented that its capital stock was $400,000.

Thayer was the holder of two hundred and eighty-five shares of the first two issues of stock. On two hundred of these shares he had paid to the company $20 per share, and on the remaining eighty-five he had paid $40 per share. He was also the holder of five hundred and eighty-five shares of the third and fourth issues, upon which he had paid the company $50 per share. No other payments were ever made by him on his shares of stock.

The other stockholders paid the same amounts on the shares of stock of the several issues held by them respectively. By agreement made at the date of the several issues of stock the amounts paid thereon were credited to the subscribers, and the balance unpaid credited by "discount," and certificates as for full-paid shares were delivered to the subscribers, and the stock account between the company and them balanced by such "discount."

On April 2, 1874, a petition in bankruptcy was filed against the company in the United States District Court for the District of Kansas. The company was adjudicated a bankrupt on the eleventh, and the plaintiffs in error were appointed its assignees on the twenty-ninth day of that month. On March 31, 1876, the assignees filed their petition in that court, wherein they prayed for an order directing them to make an assessment and call upon the unpaid stock of the company for the purpose of paying its debts.

In their petition the assignees represented as follows: " At the date of adjudication in bankruptcy the affairs of said company were in a very embarrassed and complicated condition, and much time has been necessarily consumed and considerable expense incurred in opposing claims attempted to be estab-

lished in said bankrupt court for failures on the part of said company to comply with contracts made by it.    Many fraudulent claims for large amounts have been filed against said bankrupt, requiring time to oppose and defeat, which have been defeated.    The litigated claims are now reduced to a small number, not covering more than ten thousand six hundred and one dollars and eighty cents.    The property of the company on hand at the date of adjudication in bankruptcy has been disposed of as rapidly as seemed conducive to the interests of all concerned.    The sale of a portion of the real estate has been delayed in the hope that the demand for land would increase, and your petitioners realize something out of it for the benefit of the creditors.  Your petitioners believe, however, that any further delay in the disposal of the bankrupt's property would not be advantageous.

"Your petitioners had intended before making this application to have fully closed up the contest over litigated claims, disposed of assets of the company, and collected all its bills receivable, but find it is impossible to accomplish it without a longer postponement than is convenient or expedient."

The petition further averred that " the amount of the liabilities of the bankrupt over and above the assets is $124,684, while the amount yet due and unpaid on the stock held and owned by said stockholders is $222,650."

By an amendment to their petition, the assignees represented as follows: " That an assessment of seventy-six per cent upon the par value of each share of stock in said company, if credited with the amount paid each stockholder heretofore, would equalize the burden upon the stockholders, and also bring into the hands of your petitioners a sufficient amount to pay the debts of the company."

Upon the filing of this petition, the court made an order that all the stockholders of the bankrupt company show cause on April 21, 1876, why the assessment and call prayed for in said petition should not be made, and that the assignees cause a copy of the order to show cause to be mailed to each stockholder at his usual place of residence and address, and also give notice by publication in the " Fort Scott

Daily. Monitor," for at least ten days before the said April 21, 1876.

By order of the court, the hearing of the rule was postponed to June 10, 1876. R. S. Watson, a stockholder, had in the mean time filed exceptions to the rule, on behalf of himself and all other stockholders desiring to avail themselves thereof. On the date last named, the petition and amended petition of the assignees, and the exceptions thereto, came on for hearing, whereupon the court overruled the exceptions, and decreed that an assessment and call be made upon the stock of the company of seventy-six per cent, upon which should.be credited to each stockholder any sums paid by him on his shares, and that the sum so assessed should be paid to the assignees on or before Aug. 1, 1876, and in default of payment they were directed to sue for and collect the same.

On July 17, 1876, the assignees made an assessment and call as authorized by the order and decree of the District Court, and gave notice thereof to the stockholders; but before the assessment could be collected, Watson, the stockholder before mentioned, filed with the circuit judge a petition for the reversal of the order and decree of the District Court authorizing the assessment and call.

It does not appear from the record upon what day this petition was filed. But on Dec. 4, 1876, the decision of the circuit judge thereon was transmitted to the District Court, affirming its decree, "with this modification: that the said District Court enter an order allowing each stockholder of said bankrupt company who shall pay the amount of said assessment on his stock in ninety days from this twenty-ninth day of November, 1876, a credit on his or her proportion of the amount so assessed as was included in said assessment for the purpose of paying the costs of enforcing by suit the collection of said assessment."

The District Court, on Dec. 4, 1876, entered a decree in conformity with the order of the circuit judge.

Thayer having failed to pay within the time limited by the court the assessment made upon him on account of his stock, although served with notice to do so, the assignees, on April 9, 1877, brought against him, in the Circuit Court of the United

States for the District of Massachusetts, an action at law to recover the sum of $27,160, the amount of the assessment on his unpaid stock.

The declaration alleged in substance the facts above recited.

The defendant filed two pleas, the first of which was a general denial of the allegations of the declaration, and the second set up the limitation of two years prescribed by sect. 2 of the act of March 2, 1867, c. 176, and now embodied in the Revised Statutes as sect. 5057.

The case was submitted to the Circuit Court upon an agreed statement of facts. The court found for the defendant, holding, in an opinion which appears in the record, that the cause of action was barred by the limitation of two years pleaded. Judgment was, therefore, rendered for him. The plaintiffs below brought the case here, and assign for error the ruling upon the Statute of Limitations and the rendition of the judgment for defendant.

*Mr. J. E. McKeighan* and *Mr. A. A. Ranney* for the plaintiffs in error.

*Mr. Sidney Bartlett*, *Mr. William G. Russell*, and *Mr. George Putnam* for the defendant in error.

Mr. Justice Woods, after stating the case, delivered the opinion of the court.

The averments made in the declaration were substantially supported by the agreed statement, and there should have been judgment thereon for the plaintiffs, unless, upon the facts as disclosed, they were shown not to be entitled to a recovery on the merits, or unless the Statute of Limitations was a bar to the action.

The defendant insists, *first*, that the third and fourth issues of stock, which were made after the limit had been reached, within which the amount of capital stock of the company was restricted by the laws of Kansas, were absolutely void, and no assessment could be made on them which he was bound to pay; *secondly*, that the sums voluntarily paid by him upon his void stock should be applied to the payment of the balance due on his valid stock, and that when so applied they

would fully satisfy the assessment thereon; and, *thirdly*, that in any event the facts sustained the plea of the Statute of Limitations. We shall consider these contentions in the order stated.

The Constitution of Kansas forbids special charters. Art. 12, sect. 1. All corporations in that State are, therefore, organized under general laws. The Fort Scott Coal and Mining Company was organized under the general law of the State, which, with its articles of incorporation, that were required to be filed with the secretary of state, constituted its charter. By those articles the original stock of the company was fixed at $100,000. Chap. 23, sect. 14, of the Statutes of Kansas provides that " any incorporation may increase its capital stock to any amount not exceeding double the amount of its authorized capital." The second issue increased the stock to $200,000, which was the limit prescribed by the charter. The question, therefore, is whether the stock of the third and fourth issues, by which the aggregate amount was raised to $400,000, is or is not void.

As a general rule, corporations can have and exercise only such powers as are expressly conferred on them by the act of incorporation, and such implied powers as are necessary to enable them to perform their prescribed duties. *Fertilizing Company* v. *Hyde Park*, 97 U. S. 659; *Salomons* v. *Laing*, 12 Beav. 339; *Eastern Counties Railway* v. *Hawkes*, 5 H. L. Cas. 331.

And it is well settled that a corporation has no implied power to change the amount of its capital as prescribed in its charter, and that all attempts to do so are void. *Mechanics' Bank* v. *New York & New Haven Railroad Co.*, 13 N. Y. 599; *New York & New Haven Railroad Co.* v. *Schuyler*, 34 id. 30; *Railway Company* v. *Allerton*, 18 Wall. 233; *Stace & Worth's Case*, Law Rep. 4 Ch. App. 682, note.

In this case the attempt to increase the stock of the company beyond the limit fixed by its charter was *ultra vires*. The increased stock itself was, therefore, void. It conferred on the holders no rights and subjected them to no liabilities. If the stock of the first and second issues had been held by one set of holders, and the stock of the third and fourth by another, in a

contest between them the latter would have been excluded from all participation in the management of the company or in its profits. To decide that the holders of stock issued *ultra vires* have the same rights as the holders of authorized stock, is to ignore and override the limitations and prohibitions of the charter. We think it follows that if the holder of such spurious stock has none of the rights, he can be subjected to none of the liabilities of a holder of genuine stock. His contract to pay for spurious shares is without consideration and cannot be enforced.

It is insisted, however, that the defendant having attended by proxy the meetings at which the increase of the stock beyond the limit imposed by law was voted for, and having received certificates for the stock thus voted for, and after such increase the company by its agents having held itself out as possessing a capital of $400,000, and invited and obtained credit on the faith of such representations, he is now estopped from denying the validity of the stock and his obligation to pay for it in full.

We think that he is not estopped to set up the nullity of the unauthorized stock. It is true that it has been held by this court that a stockholder cannot set up informalities in the issue of stock which the corporation had the power to create. *Upton* v. *Tribilcock*, 91 U. S. 45; *Chubb* v. *Upton*, 95 id. 665; *Pullman* v. *Upton*, 96 id. 328. But those were cases where the increase of the stock was authorized by law. The increase itself was legal and within the power of the corporation, but there were simply informalities in the steps taken to effect the increase. These, it was held, were cured by the acts and acquiescence of the defendant.

But here, the corporation being absolutely without power to increase its stock above a certain limit, the acquiescence of the shareholder can neither give it validity, nor bind him or the corporation. "A distinction must be made between shares which the company had no power to issue and shares which the company had power to issue, although not in the manner in which, or upon the terms upon which, they have been issued. The holders of shares which the company has no power to issue, in truth had nothing at all, and are not

contributors." 2 Lindley, Partnership, 138. And see *La-throp* v. *Kneeland,* 46 Barb. (N. Y.) 432; *Mackley's Case,* 1 Ch. D. 247.

In *Stace & Worth's Case (supra)* it appeared that there was an agreement for the amalgamation of the London North-ern Insurance Corporation and the Life Investment Mortgage Insurance Company, the two corporations to be formed into one, under the name of the corporation first mentioned. The corporation was to issue shares in exchange for those held in the company, and the amalgamated board was to consist of the five directors of the corporation, and of seven of the directors of the company, to be selected by themselves. After the amalgamation Stace and Worth, it was alleged, received and accepted certificates for shares in the corporation in exchange for their shares in the company, and they with five others were appointed directors of the corporation. Afterwards a resolution was passed for voluntarily winding up the corporation, and the names of Stace and Worth were placed upon the list of contributors. An application to have their names removed from the list was made to Vice-Chancellor James, who, after hearing the case argued, directed their names to be removed. This was done on the ground that the agreement for amalgamation was beyond the powers of the corporation, and, therefore, void. In giving the reasons for his decision he said: "It is, however, contended that notwithstanding the agreement itself was *ultra vires* and void, yet there are personal acts and things personally affecting these two gentlemen which render them still liable as shareholders." These were the acceptance of shares by Stace and Worth, the fact that their names appeared on the register of shareholders, and that they had sat as directors of the corporation after the attempted amalgamation. But he declared: "This was a void agreement with a void acting upon it, a void recognition, and a void ratification by the acts which have been mentioned. It comes to an aggregate of nothings, and that aggregate of nothings is all that there is to fix those gentlemen on the list of stockholders."

So in *Zabriskie* v. *Cleveland, Columbus, & Cincinnati Railroad Co.* (23 How. 381), this court, after holding the railroad

company to be liable on certain bonds which it was alleged had been indorsed by the directors without lawful authority, added : " This principle does not impugn the doctrine that a corporation cannot vary from the object of its creation, and that persons dealing with a company must take notice of whatever is contained in the law of its organization."

Upon the principles stated in these authorities, we are of opinion that the defendant is not estopped by any acts of his, to assert the invalidity of the stock issued in excess of the limit authorized by the charter, and to deny his liability thereon.

It would seem to follow that if he is not estopped by his own acts, he is not by the acts of the agents of the Fort Scott Coal and Mining Company, in representing the company, by advertisements and otherwise, as having a capital of $400,000.

The officers of the company had no authority to make these representations, and the public no right to trust them. Persons dealing with the managers of a corporation must take notice of the limitations imposed upon their authority by the act of incorporation. *Zabriskie* v. *The Cleveland, Columbus, & Cincinnati Railroad Co.*, *supra*. The laws secured to the public and the creditors an infallible mode of ascertaining the real capital of the company. They were bound to know that the law permitted no such increase of its capital stock as the company had attempted to make, and that any representation that it had been made was false.

As forcibly suggested by counsel, a creditor, who has been defrauded by misrepresentation of the real capital of the company, has his remedy in an action of tort against all who participated in the fraud. But the wrong done to him cannot entitle the entire body of creditors, who have not suffered from the alleged fraud, to recover of the entire body of stockholders, who have taken no part in it.

We are of opinion, therefore, that the defendant is not estopped by the acts of the agents and officers of the company to allege the nullity of the overissue stock, and his nonliability to an assessment on such void stock.

The next question for our consideration is whether he is

entitled to offset against his liability to pay the sum due on his valid stock, the money paid on his void stock. ·

It is a general rule that a holder of claims against an insolvent corporation cannot set them off against his liability for an assessment on his stock in the corporation in a suit by an assignee in bankruptcy. *Sawyer* v. *Hoag*, 17 Wall. 610; *Sanger* v. *Upton*, 91 U. S. 56; *Scammon* v. *Kimball*, 92 id. 362; *County of Morgan* v. *Allen*, 103 id. 498.

The ground upon which this rule stands is thus stated by Mr. Justice Miller in *Sawyer* v. *Hoag:* " The debt which the appellant owed for his stock was a trust fund devoted to the payment of all the creditors of the company. As soon as the company became insolvent, and this fact became known to the appellant, the right of set-off for an ordinary debt to its full amount ceased. It became a fund belonging in equity to all its creditors, and could not be appropriated by the debtor to the exclusive payment of his own claim."

The defendant seeks to avoid the application of this rule to his case, on the ground that the real capital of the company was only $200,000, and this constituted the trust fund for the security of the debts of the company; that all the money that had been paid in as capital stock had been paid into that fund, and that the party paying any money to that fund was entitled to credit upon his dues thereto.

We cannot assent to this view. He was as much bound to know the limits of the charter of the company in which he was a stockholder, as the public or creditors of the company. He knew, therefore, that all stock issued beyond the limit fixed by the charter was absolutely void. When he paid in his money on the void stock, he knew that he was not paying it on the valid stock, and he is presumed to have known that it was not a good payment on the valid stock. The company had no right to apply it on the valid stock, without his direction. He never directed such application, and it remained in the possession of the company until the rights of the assignees in bankruptcy attached. · To say that it was a contribution to the trust fund devoted to the payment of the creditors of the company is an entire misapprehension. It could not be such contribution unless it were a payment on the stock, and this,

we have seen, was not the case. No call had been made for payment on the valid stock, to which the amounts paid on the void stock could be said to apply. No call could have been made by the company under its agreement with the stockholders, unless to pay its creditors, and it does not appear that when the payments were made the company had any creditors. It was a voluntary payment for the benefit of the company, and tended to increase the value of the authorized stock. In that way the stockholder got the benefit of it. There is no rule of law or equity which entitles him, in a contest between himself and a creditor of the company, either to receive a credit for it on his unpaid stock, or to have it repaid to him *pro rata* out of the assets of the company. We are of opinion, therefore, that it could not be offset against the money due on the valid stock held by him.

We are next to consider whether, upon the facts as disclosed by the record, the defence of the Statute of Limitations should have been sustained. The precise question with which we have to deal is, When would this action at law, brought by the assignees of the bankrupt company against a stockholder, to recover a part of the balance due on his stock, be barred by the statute?

This will depend on the answer to the question, When did the cause of action accrue to the assignees? In other words, When could they have commenced this action against this defendant to recover the amount due on his stock? *Wilcox* v. *Plummer's Ex'rs*, 4 Pet. 172; *Amy* v. *Dubuque*, 98 U. S. 470.

The stock held by the defendant was evidenced by certificates of full-paid shares. It is conceded to have been the contract between him and the company that he should never be called upon to pay any further assessments upon it. The same contract was made with all the other shareholders, and the fact was known to all. As between them and the company this was a perfectly valid agreement. It was not forbidden by the charter or by any law or public policy, and as between the company and the stockholders was just as binding as if it had been expressly authorized by the charter.

If the company, for the purpose of increasing its business, had called upon the stockholders to pay up that part of their stock, which had been satisfied "by discount" according to their contract, they could have successfully resisted such a demand. No suit could have been maintained by the company to collect the unpaid stock for such a purpose. The shares were issued as full paid, on a fair understanding, and that bound the company.

In fact, it has been held in recent English cases that not only is the company but its creditors also are bound by such a contract. *Waterhouse* v. *Jamieson,* Law Rep. 2 H. L. (Sc.) 29; *Currie's Case,* 3 De G., J. & S. 367; *Carling, Hespeler, and Walsh's Cases,* 1 Ch. D. 115.

But the doctrine of this court is, that such a contract, though binding on the company, is a fraud in law on its creditors, which they can set aside; that when their rights intervene and their claims are to be satisfied, the stockholders can be required to pay their stock in full. *Sawyer* v. *Hoag, Assignee,* 17 Wall. 610; *New Albany* v. *Burke,* 11 id. 96; *Burke* v. *Smith,* 16 id. 390.

The reason is, that the stock subscribed is considered in equity as a trust fund for the payment of creditors. *Wood* v. *Dummer,* 3 Mas. 308; *Mumma* v. *Potomac Co.,* 8 Pet. 281; *Ogilvie* v. *Knox Insurance Co.,* 22 How. 387; *Sawyer* v. *Hoag, supra.* It is so held out to the public, who have no means of knowing the private contracts made between the corporation and its stockholders. The creditor has, therefore, the right to presume that the stock subscribed has been or will be paid up, and if it is not, a court of equity will at his instance require it to be paid.

In this case the managers and agents of the bankrupt company had in effect represented to the public that all its capital stock had been subscribed for, and had been or would be paid in full. Considered, therefore, in the view of a court of equity, the contract between the company and its stockholders was this, namely, that the stockholders should pay, say, for example, twenty dollars per share on their stock and no more, unless it became necessary to pay more to satisfy the creditors of the company, and when the necessity arose and the amount required

was ascertained, then to make such additional payment on the stock as the satisfaction of the claims of creditors required.

When the company was adjudicated a bankrupt, the assignees were bound by this contract, thus equitably construed. Their duty was to collect a sufficient sum upon the unpaid stock, which, with the other assets of the company, would be sufficient to satisfy the company's creditors. They were authorized to collect no more. If it should turn out that the other assets were sufficient, no action would lie against the stockholder for the balance due on his stock. For if in a bankruptcy proceeding any surplus remained after payment of debts, it would go to the company and not to the stockholders. And we have seen that the company in this case would have no right to any surplus.

The question for solution is, therefore, When, under the facts of this case, did the cause of action accrue against the defendant in error? Certainly not until it became his duty to pay according to the terms of his contract or according to law.

It is well settled that when stock is subscribed to be paid upon call of the company, and the company refuses or neglects to make the call, a court of equity may itself make the call, if the interests of the creditors require it. The court will do what it is the duty of the company to do. *Curry* v. *Woodward*, 53 Ala. 371; *Robinson* v. *Bank of Darien, &c.*, 18 Ga. 65; *Ward* v. *Griswoldville Manufacturing Co.*, 16 Conn. 593. But under such circumstances, before there is any obligation upon the stockholder to pay without an assessment and call by the company, there must be some order of a court of competent jurisdiction, or, at the very least, some authorized demand upon him for payment. And it is clear the Statute of Limitations does not begin to run in his favor until such order or demand. *Van Hook* v. *Whitlock*, 3 Paige (N. Y.), 409; *Salisbury* v. *Black's Adm'r*, 6 Har. & J. (Md.) 293; *Sinkler* v. *The Turnpike Company*, 3 Pa. 149; *Walter* v. *Walter*, 1 Whart. (Pa.) 292; *Quigg* v. *Kittredge*, 18 N. H. 137; *Nimmo* v. *Walker*, 14 La. Ann. 581.

In this case there was no obligation resting on the stockholder to pay at all until some authorized demand in behalf of creditors was made for payment. The defendant owed the

creditors nothing, and he owed the company nothing save such unpaid portion of his stock as might be necessary to satisfy the claims of the creditors. Upon the bankruptcy of the company his obligation was to pay to the assignees, upon demand, such an amount upon his unpaid stock as would be sufficient, with the other assets of the company, to pay its debts. He was under no obligation to pay any more, and he was under no obligation to pay anything until the amount necessary for him to pay was at least approximately ascertained. Until then his obligation to pay did not become complete.

But not only was it necessary that the amount required to satisfy creditors should be ascertained, but that the agreement between the company and the stockholder to the effect that the latter should not be required to make any further payments on his stock should be set aside as in fraud of creditors. No action at law would lie to recover the unpaid balance due on the stock until this was done. The proceeding for an assessment in the bankruptcy court was in effect a proceeding to accomplish two purposes: first, to set aside the contract between the company and the stockholder; and, second, to fix the amount which he should be required to pay. Until these things were done the cause of action against the stockholder did not accrue, although his primary obligation was assumed at the time when he subscribed the stock.

It appears from the petition of the assignees for an assessment upon the stock of the bankrupt company, that they had used due diligence to ascertain what additional payments on the stock would be required to pay off the claims of creditors; that at as early a time as possible they applied to the court for an order directing that the stockholders should pay a part of the amount due on their shares of stock, and assessing the stock therefor; that the order was made accordingly, and within five months thereafter this action at law was begun to enforce its payment.

If, therefore, the right to bring this suit did not accrue to the assignees until the assessment was made upon the stock by the court, and the stockholders were required to pay it, the action was brought long before the limitation of the statute could bar it.

All the delay which has occurred has been caused by the proceedings of the assignees, taken for the benefit of the stockholders, in order that they might not be subjected to unnecessary and onerous exactions. The lapse of time between the filing of the petition for the assessment and the decree of the bankruptcy court thereon is chargeable to continuances made by order of the court and to the opposition of the stockholder referred to. It does not lie in the mouth of the defendant to say that, while the steps necessary to fix his liability and limit its amount were being taken, the bar of the statute has intervened and cut off his liability altogether.

The cases cited by the defendant to sustain his contention, that the cause of action accrued to the assignees in bankruptcy at the time of their appointment, are clearly distinguishable from this. In *Terry* v. *Tubman* (92 U. S. 156), the suit was by a bill-holder of an insolvent bank against a stockholder to enforce the individual liability of the latter to pay the bills of the bank held by the former. The court decided that the case was not so much like that of the guarantee of the collection of a debt, where a previous proceeding against the principal is implied, as it was like a guarantee of payment where resort may be had at once to the guarantor, without a previous proceeding against the principal. The conclusion of the court, therefore, was that the cause of action in favor of the bill-holder arose against the stockholder when the bank ceased to redeem its notes and became notoriously and continuously insolvent. It is clear that this authority has no application to the question in hand.

The case of *Terry* v. *Anderson* (95 U. S. 628), also relied on by the defendant, was a suit in equity to enforce the individual liability of the stockholders of a bank, and to collect unpaid subscriptions to its capital stock. There was no agreement on the part of the bank not to collect the balance due on the stock. The bank itself could have enforced payment, without regard to the necessity for its collection, to satisfy the debts of the bank. And so the court held that the Statute of Limitations began to run against the bank and its creditors, in favor of the stockholder, when the bank stopped payment.

In *Baker* v. *Atlas Bank* (9 Metc. (Mass.), 182), and *Commonwealth* v. *Cochituate Bank* (3 Allen (Mass.), 42), also relied on by the defendant, it appeared that upon suspension of payment by the banks there was a present and unconditional liability of their stockholders, which the court held was barred by the limitation of six years. In the case of *Baker* v. *Atlas Bank* the court said: "The demand sought to be enforced in this suit was a debt alleged to be due to the bank. Whenever, therefore, the bank became insolvent by the loss of its capital stock an action accrued to the bank, according to the construction of the thirtieth section (Rev. Stat., c. 36), which is contended for by plaintiff's counsel to recover the sum from the stockholders respectively, equal to each one's share of stock. The statute, therefore, began to run in strictness immediately on the loss of the capital stock, and certainly when the bank stopped payment, and after the lapse of six years from that time the debt was barred."

But in the present case, as we have seen, there was, as between the company and its stockholders, no obligation on the part of the latter to pay the residue of their stock, unless it became necessary to satisfy creditors. We think, therefore, we are safe in saying that the statute did not begin to run in favor of the stockholders until at the very least the necessity for the payment had been ascertained, and an authorized demand of payment made.

It is said by the defendant that to hold that the suit to recover the sums due on the stock held by him is not barred would defeat the policy of the Bankrupt Act, which is a speedy settlement of the bankrupt's estate and the equitable distribution of his assets among the creditors.

Unquestionably a prompt administration of the bankrupt's assets was one of the ends which that act had in view; but this policy must be held to be subordinate to a just regard for the rights of both the creditors and debtors of the bankrupt estate. The debtor cannot be forced to pay before his contract requires it, merely because the assignee may be in haste to close up the estate. If his obligation were evidenced by a promissory note due at a future day, he could not be compelled to pay it before maturity in order that the estate

might be speedily settled. So if some act must be done by the assignee, such as a demand of payment before his liability is fixed, he cannot be compelled to pay until the prerequisites have been performed. In short, until an unconditional liability to pay something is fastened on the debtor no action can be maintained against him, and the Statute of Limitations does not begin to run in his favor. The suggestion that the assignee may postpone indefinitely the necessary steps to fix the liability of the debtor, and thus defeat the policy of the law, does not answer the proposition that the debtor cannot be sued until a cause of action has accrued against him. It is presumed that the assignee will do his duty. If he fails to do it he is subject to the order of the bankruptcy court, which, at the instance of those interested, can compel him to act.

Our opinion is, therefore, that this action at law, prosecuted by the plaintiffs, assignees in bankruptcy of the Fort Scott Coal and Mining Company, against the defendant, to recover from him the balance due on his unpaid valid stock in said company, was not barred by the limitation of two years prescribed by the Bankrupt Act.

For the error in holding that the action was barred, the judgment of the Circuit Court must be reversed, and the cause remanded with directions to award a

*New trial.*

MR. JUSTICE FIELD and MR. JUSTICE GRAY dissented.