THE ACADEMY OF MUSIC *vs.* FLANDERS BROTHERS.

1. It was contrary to the provisions of the law for the Academy of Music to act before the amount of its capital stock had been taken and ten per cent of the amount had been paid in, and without a compliance with this condition, it exceeded its powers in thus commencing and prosecuting its business; its action was *ultra vires* and void, and any promise or undertaking which induced it to pursue such a course was in contravention of the law, and could not be invoked as an estoppel in a suit to recover the amount of stock subscribed.

2. The pleas in this case were so connected as to render them difficult to be separated and treated as independent of those preceding;

the pencil numbering on the margin was doubtless for convenience in distinguishing the subjects set up by the pleas; and the verdict found in effect that the principal fact set up in the plea numbered 5 was proved, and, under the law given in charge, barred a recovery by the plaintiff, and such a verdict was not without foundation in the pleadings.

(*a.*) A majority of shareholders, acting lawfully and regularly under a corporation in all respects valid, have no power, without the assent of the other stockholders, to accept a material alteration in the charter of the company, enabling it to erect a structure with money raised by mortgaging the entire property, instead of that paid in for stock as originally contemplated, so as to bind the other stockholders who do not concur therein or assent thereto. This would release the other original subscribers to stock from their obligation to pay for it. Much less has a corporation such power which, though legally chartered, is acting in violation of the rules of law prescribing the performance of certain conditions before they can act in a corporate capacity.

(*b.*) The result in this case was the only one which could legally have been reached, and a verdict for the defendant was required by the law and evidence.

January 5, 1886.

Corporations. Charters. Stock and Stockholders. *Ultra Vires*. Before Judge SIMMONS. Bibb Superior Court. April Term, 1885.

This was a suit for unpaid subscriptions to its stock, brought by a corporation called " The Academy of Music," against Flanders Brothers, a firm composed of R. H. Flanders, J. P. Flanders and W. E. Flanders

The declaration and amendment thereto set forth that in February, 1882, said firm, in company with many others, signed the following written agreement:

"We, the undersigned, hereby subscribe for the amount of stock opposite our names, and agree to pay the same in four quarterly installments, viz: February 15, April 15, June 15, and August 15, for the purpose of forming a company to erect an Academy of Music.

"(Signed)      FLANDERS BROTHERS, 10 Shares, $250."

That at the April term, 1882, of Bibb superior court, the Academy of Music was duly incorporated in pursuance of the agreement, and it appearing to the court that ten per

cent of its capital stock had actually been paid in, it was authorized by the express terms of its charter to begin to do business at once; that it began to do business, and called in subscriptions, and that the defendants paid the first two installments, but refused to pay the other two, and this suit was brought to collect the unpaid balance of said sub-scription; that defendants recognized the corporate exist-ence of plaintiff and its right to proceed to do business be-fore the entire amount of its capital stock had been sub-scribed for, and its right to issue bonds under its charter, and paid the second of these assessments in May, 1883, when these facts were well known to them, or could have been ascertained by reasonable diligence.

The defendants filed the following pleas in addition to the general issue:

1st. That while they did sign the agreement, it was in-complete, and did not set out all the terms of the contract, that it was understood by these defendants, and it was gen-erally understood and agreed at the public meetings held in advance of subscription by those who subse-quently subscribed for the purpose of promoting this enterprise, that a building, to be used as an academy of music, was to be erected by stock subscriptions only, and not by the issuing of mortgage bonds upon the building, and that the capital stock of this corporation was to be $50,000; that the defendants subscribed for stock under this im-pression and under these assurances and representations; that, without their knowledge or consent, a charter was obtained, the legality of which they do not admit, fixing the capital stock at $50,000; that certain parties, claiming to be directors, proceeded to purchase a lot and to erect a building before the amount of $50,000 had been subscribed; that without any authority from the stockholders or call-ing any meeting of them, and when only $25,000 of stock had been subscribed, the pretended directors abandoned all efforts to raise the amount required by the charter and deemed necessary for the project, and without the knowl-

edge or consent of the defendants, proceeded to obtain a pretended amendment to the charter, authorizing the issuing of bonds, secured by mortgage, to carry out the enterprise; that this was in violation of the agreement, and defendants would not have subscribed had they known of any such contemplated action; that bonds to the amount of $28,000 were issued, which was without the knowledge or consent of defendants, and, as far as they know, without the knowledge or consent of a majority of the subscribers; that upon ascertaining this, defendants repudiated their subscription; that they had subscribed for $500 of the stock, and had paid $250 on the subscription before ascertaining these facts, and they pray judgment therefor; that the mortgage to secure the bonds covered all the property of the corporation and rendered its stock valueless; and that all effort to obtain the amount of stock required by the charter had long since been abandoned.

2d. That the plaintiff was illegally and fraudulently organized, because it began to do business before ten per cent of its capital stock had been paid in, and until the same had been paid in, it could not maintain a suit against these defendants.

3d. That plaintiff had released some of the co-subscribers of defendants without their knowledge or consent, and that they were thereby themselves released.

4th. That defendants' subscription was given in contemplation of obtaining a charter to incorporate the plaintiff; that said charter embodies the terms and conditions between plaintiff and defendants, one of which was that the capital stock should be $50,000, and a subscription to that amount was necessary before defendants could be called on for their subscription; that said amount of $50,000 had never been subscribed for, and the effort to obtain it was abandoned; and that the defendants never acquiesced in this.

5th. "Defendants further plead, in bar to plaintiff's right to recover against them, that, by reason of the material

v 75-2

and radical change in the charter of said plaintiff, by which they sought and obtained the power to issue mortgage bonds to the full amount of capital stock subscribed, which was not contemplated by the original charter, nor by the defendants when they subscribed, which was done without the knowledge or consent of defendants, and which they have in no way ratified, whereby defendants have been fully released from all liability on said subscriptions, and of this they put themselves upon the country."

6th. That plaintiff had issued preferred stock to the amount of $4,000, agreeing to pay 6 per cent interest thereon and giving said stock a lien upon the amounts recovered from these defendants, in payment of their subscriptions, the same being a scheme to give control of the property to a few, to the exclusion of defendants and others, who are not possessed of like means.

7th. Because the advertisement of the petition of incorporation was published only on Sunday. [This plea was, on demurrer, stricken by the court, as was also another plea, No. 8, to the effect that the stock subscription sued on was not in the line of the partnership business of the firm of Flanders Bros.]

The numbering of these pleas appears in the record in pencil, on the margin of the paper.

To each of these pleas plaintiff's counsel demurred, but the demurrer was overruled as to all except the last two named.

On the trial, the evidence on behalf of the plaintiff was, in brief, as follows: The charter was granted at the April term, 1882, of Bibb superior court. The petition for it stated the capital stock at $50,000, to be divided into shares of $25 each. It stated that ten per cent had been paid in and the remainder was to be paid in as called for. It asked power to issue bonds, secured by mortgage, to the extent of two-thirds of the capital paid in at the time of the issue, and that petitioners be allowed to do business at once. The order incorporating the company stated that

the petitioners were incorporated with the rights and privileges set forth in the application. At the same term of court, an amendment to the charter was granted, giving authority to issue bonds to the full amount of the capital stock paid in, instead of two-thirds thereof. On February 16, 1882, a stockholders' meeting was held and reports made fixing probable cost of building at $42,200, and stating what certain sites could be purchased for. Directors were elected to manage the affairs of the company and were empowered to adopt by-laws, proceed with business, call for the assessment on stock and transact the general business of the company, to purchase a site and to make application for a charter. One of the defendants was present and took part in this meeting. No other stockholders' meeting was held until February 14, 1884, when only 284 shares of stock were represented. Directors were elected. The next meeting was held on March 8, 1884, at which 204 shares were represented personally and 353 by proxy, making a total of 557. Notice of these meetings was published. At each of them mention of the bonds issued was made, and at that of March 8, a resolution was adopted, reciting the issue of bonds by the directors and ratifying their action. A proxy, giving J. S. Johnson the right to represent the undersigned as fully as they might act if they were present, and to vote their stock at the meeting, was signed, among others, by the defendants (one of them, R. H. Flanders, signing it for the firm, and also signing for W. E. Flanders as to twenty shares and O. H. Flanders as to ten). Johnson voted under this proxy in favor of the resolution ratifying the issue of the bonds. They paid the first two assessments on their subscription, the last of the two being on May 19, 1883. When called on for the last two, one of them said they had subscribed to keep the jail from being located on the block, and that when it was located elsewhere, they would pay their subscription. The president instructed the secretary to notify all stockholders before the bonds were issued and request them to take

bonds to the amount of their stock. There has been paid in $25,000 on the stock, and bonds to that amount have been issued. Of the stock $4,000 is preferred. About that amount of subscriptions is in litigation, and the preferred stock was substantially a loan, and as fast as collections are made on the common stock, this preferred stock is directed to be paid off. This was needed to complete the building. The entire amount of common stock subscribed was about $27,000 (so stated the secretary; the president supposed over $35,000 had been subscribed); of this $20,800 was paid in, and there was $4,000 of preferred stock; bonds were issued to the amount of $25,000, which brought in net cash $23,519.95. Before the charter was obtained, but after the meeting of February 10, 1882, a lot was bought and $1,750 paid for it. The title was taken in an individual, and after the charter was granted, the deed was made to the company. A report of this purchase was made April 17, 1882 (erroneously written 1883). No subscribers were released. A mistake occurred in putting down the name of one Mansfield as a subscriber for ten shares. This was done without authority from him. He took only five shares.

The evidence on behalf of the defendants was, in brief as follows: They subscribed for ten shares of stock on the understanding that the building was to be erected by subscriptions, which were to be $50,000; they made two payments, but knew nothing of the issue of bonds until about the time of the bringing of this suit, and would not have subscribed for ten shares if they had known of the intention to issue bonds They made the statement, as to paying the balance when the jail was located, without knowing of the bonds. They attended no meeting after the preliminary meeting; never saw the charter, and did not know of its amendment; never received or saw any notice of a stockholders' meeting. The idea on which subscriptions were given was that the building was to be erected entirely by subscription. No mention of issuing bonds was made.

The amount was mentioned, and it was stated in public speeches that the amount to erect the building could be raised by subscription. The stock is practically valueless, with the amount of bonds issued. A young clerk in the office of the secretary of the company went to the defendants' place of business and presented the proxy for signature. R. H. Flanders, one of the defendants, stated that his brother had attended to the matter and was absent; he himself knew little or nothing of it. The young man stated that they could not get a body of men together; that it was desired for Johnson to get a power of attorney to organize and go ahead with business. Flanders then signed. The other defendants did not know of the proxy until the trial. Nothing was said about issuing bonds, and the defendants did not know how Johnson voted the proxy.

The jury found for the defendants on the fifth plea.

The plaintiff moved for a new trial, which was overruled, and it excepted.

R. W. PATTERSON, for plaintiff in error.

DESSAU & BARTLETT, for defendants.

HALL, Justice.

This, like the case of *Hendrix vs. The Academy of Music*, determined at September term, 1884, of this court,[*] invokes the right of this corporation to recover the amount subscribed by each of those who thereby agreed to become shareholders, before the entire amount of the capital stock required by its charter had been subscribed. The pleas filed here were, in substance, the same as those then relied on, and which we held, if proved, were sufficient to defeat the action. In that case, there was no evidence of any express or implied ratification by the stockholder of the action of the corporation in commencing and carrying on

_____

[*] 73 *Ga.*, 437.

business before the capital stock was all taken, or in authorizing an amendment of the charter, which allowed it to mortgage the whole of its effects in order to raise money to prosecute to completion the enterprise for which it was created. In this case, however, there was some evidence on both these points, and it was insisted that the defendants were thereby estopped from denying their liability to pay for the stock they had promised to take.

1. It was certainly contrary to the provisions of the law for this corporation to act before the amount of its capital stock had been taken, and ten per cent of that amount had been paid in, and without a compliance with this condition, it is clear that it exceeded its powers in thus commencing and prosecuting its business; its action was *ultra vires* and void, and any promise or undertaking which induced it to pursue such a course was in contravention of the law, and could not be invoked as an estoppel in a suit to recover the amount of stock subscribed. Scovill *vs.* Thayer, 105 U. S. R., 143, is directly in point, and settles the principle which must control this case. The well considered and exhaustive opinion of Mr. Justice Wood deals with every aspect of the questions here made, and establishes, beyond doubt, that the acts which it is insisted were ratified by the defendants were incapable of ratification.

2. The verdict in this case was rendered on what is claimed to be the defendants' 5th plea, which sets up the alteration of the charter of the company, in a material particular, without the concurrence and against the consent of defendants. It is now insisted that this was not in itself a complete plea; that, taken alone and regarded as entirely distinct from the others, it forms no issue; that a verdict rendered on it is without foundation or meaning; and that it can have no legal effect. If this position could be sustained by the facts, and by the law, it would be decisive of the motion for a new trial, as it would be impossible to uphold the verdict by any reasonable intendment,

or proper construction, however favorable, and would make a clear case of necessity for setting it aside. Upon looking into the record, we find, however, that the special pleas are so connected that it would be difficult to separate them, so as to treat any of them as independant of those which preceded it. We take it that the numbers on the margin of each of them in pencil were thus placed there for the convenience of the court and counsel in distinguishing the various subjects which they embraced, and that these pencil memoranda really formed no part of the pleas themselves; and thus regarding the matter, we are satisfied that all the jury intended by the verdict was that the principal fact distinctly set forth in the plea, numbered 5, was proved, and that, under the law given them in charge, this barred the plaintiff's recovery. Now, was the amendment of this charter, in a material particular, which enabled the corporation to erect this structure with money raised by mortgaging its entire property, instead of that paid in for stock, unless it had been made by the concurrence and with the consent of the defendants, binding upon them? In other words, did it release them from the payment of the amount subscribed by them for stock, especially where it is undisputed, that but little over half the capital stock had been previously subscribed for in good faith? The general rule is that " a corporation is not bound by an act of the majority of its shareholders, unless the majority were authorized by the charter to do the act on behalf of the corporation." Morawetz Priv. Corps., at the end of section 50. "A plain illustration of the inability of a majority," says this author, §53, " to exceed the powers conferred by the charter, is furnished by those cases in which an attempt was made to accept a new charter, or an amendment to an existing charter, by a vote of the stockholders. Here no question of the authority of the company to act in a corporate capacity could arise, since the legislature had given its consent to the change. The only question presented for solution was, have a majority of the shareholders in a

corporation the power, by their vote, to accept an altera-
tion of the common charter, on behalf of the company,
without having been authorized to do so by unanimous
consent? The answer was, that a majority have no such
power, and that an alteration cannot be made without the
consent of every individual stockholder. This follows,
necessarily, if a contract can be altered only with the con-
sent of all the contracting parties. Everybody knows
that if several men enter into a valid contract, it cannot
be fundamentally altered but by unanimous consent.
Why should a different rule prevail as between corpora-
tors?" The reason of the rule is given in other sections
of the author, notably in §§51, 52, 54, 55, 414, 13, 315, 354,
355 and citations, especially the New Orleans, etc., Rail-
road Company *vs.* Harris, 27 Miss., 517, 537, 539, and the
very elaborate and able opinion pronounced by McCay, J.,
in *Central Railroad Company et al. vs. Collins et al.*, 40
*Ga.*, 615 *et seq.* It will be observed that a majority of share-
holders, acting lawfully and regularly under a corporation
in all respects valid, have no such power as that insisted
on by the indefatigable, learned and astute counsel for the
plaintiff in this case. Still less has a corporation, though
legally chartered, but acting in violation of the rules of
law prescribing the performance of certain conditions be-
fore they can act in a corporate capacity, the power to
accept an alteration of its charter by a majority vote of
its shareholders, so as to be valid and binding upon the
minority, who are at liberty to dissent therefrom. Upon
principle and analogy, and according to the reasoning of
the authorities cited, this would release the original sub-
scribers to the stock from their obligation to pay for it.
The contract as altered, is not that to which they assented
when they agreed to take this stock.

The result of this trial was the only one that could have
been reached. The verdict for the defendants was required
by both the law and the evidence, and a finding for the
plaintiff would have been so manifestly contrary to both

as to compel the court upon proper proceedings to set it aside. We therefore feel gratified that we are able to find law to sustain this verdict, and trust that we shall be pardoned for indulging the hope that this will be an end to all attempts upon the part of this corporation to collect stock from their subscribers, at least until they have fully complied with all the conditions entitling them to make such demand.

Judgment affirmed.