## BARD *v.* BANIGAN.

*(Circuit Court, D. Connecticut.* June 17, 1889.)

1. PRINCIPAL AND AGENT—COMPENSATION OF AGENT.

Defendant, an experienced and successful rubber manufacturer, was employed by plaintiff's company, which was then in financial difficulties, and not succeeding well with its rubber business, to take entire charge of the business as managing agent, and as a part of the transaction he purchased 4,000 shares of its capital stock at a low price. He devoted his attention and active services to the business for over four years, when the company became insolvent. Frequently during the first year or two he stated that he was serving without compensation, but in this action, involving his right to a salary, he testified that he supposed his salary would be determined at the proper time, when the company became more prosperous, and that he would then be paid what was right for the past. There was no evidence of a contrary agreement. *Held*, that he was entitled to a reasonable salary ($2,500 per year) from the beginning of his employment.

2. CORPORATIONS—PREFERRED STOCK—UNAUTHORIZED ISSUE.

A purchaser of preferred stock issued without express statutory authority, who voluntarily subscribed and paid for it for the purpose of promoting the scheme under which it was issued, and who was a promoter of the scheme, cannot hold it for 28 months after the conditions upon which it was issued have been fulfilled, and then, on the insolvency of the company, assert the invalidity of the stock, and recover back his money.

At Law    Action by Charles Bard, receiver of the Hayward Rubber Company, against Joseph Banigan, for money had and received.

*Halsey & Briscoe,* for plaintiff.

*Doolittle & Bennett,* for defendant.

SHIPMAN, J.    This is an action at law which was tried by the court, the parties having by a duly signed written stipulation waived a jury trial, and agreed to a trial by the court. The first count of the complaint was for money had and received by the defendant for the use of the Hayward Rubber Company, before the appointment of a receiver. The second count was for money had and received for the use of the plaintiff, after his appointment as receiver. A stipulation between said parties is as follows:

"It is stipulated and agreed by and between the plaintiff and defendant in the above-entitled action that the balance due to the plaintiff from the defendant under the first count of the substituted complaint, exclusive of the disputed items of $21,808.40 claimed by the defendant for services as general manager, and of $17,550 had and received by Hayward Rubber Company in payment of preferred stock, is the sum of $10,494.96, with interest thereon from December 15, 1887, and that the balance due to the plaintiff from the defendant under the second count of the substituted complaint is the sum of $24,011, with interest from January 15, 1888."

The facts which upon such trial were found to be true, and which are true, are as follows:

The Hayward Rubber Company was a joint-stock corporation, for the manufacture of India rubber shoes, duly incorporated in accordance with the statutes of Connecticut, and located in Colchester, in this state. Its

capital stock was $400,000. The par value of its shares was $25. Before 1879 it had been a very profitable company, and had paid large dividends. Its last dividend was made in 1881. Thereafter its business deteriorated, and became unprofitable. In January, 1883, some of the principal stockholders endeavored to find a skilled rubber manufacturer, who would become interested in the company, and would oversee or direct its management, and would take the charge of selling its goods. Negotiations were entered into with the defendant, Joseph Banigan, who was president and general agent of the Woonsocket Rubber Company, and was a well-known and successful rubber manufacturer, which resulted in their agreeing to furnish him, and his agreement on January 12, 1883, to purchase, 4,000 shares of the capital stock of said company, at $12.50 per share. The agreement was carried out, and on January 30, 1883, Mr. Banigan was appointed general agent by the directors, who defined his duties, which were, in general, that he was to have full control of the manufacturing, subject to their approval. No salary was then or ever designated, nor was any vote passed on the subject. Mr. Banigan still attended to his duties and business at Providence. He went to Colchester once in a week or fortnight, remaining there one, two, or three days, as the case might be. He entered actively upon the oversight of the business; laid out and arranged for new buildings; bought new machinery; ordered new lasts, tools, rolls, and cutting machinery; had automatic sprinklers put in the mill,—all at an expense of some $120,000; inspected the new goods; secured the dismissal of old officers, appointed a new superintendent; caused a saving in the management of the business; and reduced the pay-roll, while not reducing the quantity of manufactured goods; and carried on correspondence with the new superintendent and the treasurer. He also purchased the supplies, except for three months, when he was in Europe. In April, 1883, the Woonsocket Rubber Company, 40 or 50 per cent. of the stock of which Mr. Banigan owned, became the selling agents of the Hayward Rubber Company, and so continued until 1886. At that time the various rubber manufacturing companies formed a corporation called the Rubber Boot & Shoe Selling Company, in which each company took stock, and which was to sell all the production of all the stockholders. The Hayward Rubber Company took about $24,000 of stock. The agency continued a year, with disastrous results, particularly to the Hayward Rubber Company. The Woonsocket Rubber Company then declining to be its selling agent, Mr. Banigan became such agent, and sold all the goods thereafter, upon the same commission which had been paid to the Woonsocket Company. The amount of commissions was paid. In March, 1885, a committee of the directors, of which committee Mr. Banigan was a member, sent a circular to the stockholders, recommending an increase of the capital, by the issue of preferred stock to the amount of $100,000, saying that it was desirable to have a unanimous vote in favor of the proposition, asking for proxies, and inclosing the proposed resolutions, which were to be submitted to a stockholders' meeting to be held on March 25, 1885. At said meeting the stock was increased $100,000,

by the authorization of the issue of preferred stock entitled to cumulative dividends of 8 per cent. per annum, which should take precedence of all dividends on the common stock and any future additions thereto, and which preferred stock could be retired when the financial condition of the company would warrant, in such amounts and at such times as might be determined on by vote of the stockholders, at par and accrued dividends, and such retirement should be *pro rata.* The votes in regard to the issue of preferred stock were passed by a unanimous vote of the shares present or represented at said meeting at a time when said votes were taken; being 13,404 shares. The whole number of shares was 16,000. One stockholder of record holding stock hypothecated to it, subsequently brought to the proper state court a petition for an injunction against the issue of said preferred stock, but discontinued or withdrew said petition. Each stockholder had the privilege of subscribing to said preferred stock in proportion to the number of shares of existing stock by him owned. If any stockholder neglected, for a specified time, to subscribe for his portion of preferred stock, the same could be disposed of by the treasurer, for the use of the company, at not less than par. Mr. Banigan subscribed for 702 shares of the preferred stock, and on April 2, 1885, paid the company therefor $17,550, and received a certificate for said shares, which contained, in substance, the provisions of said votes. Shares to the amount of $25,000 in all were subscribed for. The subscription agreement which Mr. Banigan and the other subscribers signed was as follows: "We, the undersigned, herewith subscribe for the number of shares of the preferred stock of the Hayward Rubber Company affixed opposite our names." The defendant voted upon his stock at one or two annual meetings thereafter. On June 26, 1885, he wrote to Potter, Lovell & Co., note brokers of Boston, inclosing a statement of the company's affairs, and saying that it had arranged to issue $100,000 preferred stock, but "only one-quarter of it has yet been issued, which I have taken principally." No claim for the repayment of this $17,550 was made until 1888. No certificate of the increase of capital stock was filed in the office of the secretary of state, or of the town-clerk of Colchester.

Mr. Banigan continued to be the general agent until the company went into the hands of a receiver, on August 9, 1887. No charge was made by him on the books of the company and no claim was made for salary until after the appointment of the receiver. At the annual meeting of the stockholders in January, 1884, he said to them that he was serving the company without compensation. At another subsequent meeting of the stockholders, when his management was criticised, he justified it, and said that he was not receiving compensation for his services. On May 26, 1887, he wrote to the treasurer criticising a neglect to receive the company's goods from the selling company, and said: "I am not under pay by the Hayward Rubber Company, and I should not be expected to look after such business, but, if no one gives it any attention, I feel it incumbent on myself to protect the company." He testified, upon cross-examination, that he supposed his salary would be

determined at the proper time, when the company was in funds; and, further, that he supposed when the company got in good condition he was to have a salary. There was no understanding, express or implied, that he was to have no salary in consideration of the sale of 4,000 shares at $12.50 per share. Nobody testifies to that effect. He made a large investment in the stock, at a price supposed to be cheap, in the expectation that it would be a profitable one. The stockholders wanted him to become pecuniarily interested in the company, and so be stimulated to render it valuable services and assistance. He thought that the company was not in a condition to pay large salaries, and was out of funds, and therefore took no money and made no charge. When it became prosperous, he expected to have a large salary for the future, if he remained in the company, and that he would be paid something that was in the way towards compensation for the past. He trusted that future success would enable him to be compensated. He thus truthfully said that he was serving without pay. He was not at that time receiving, and it might be that he would never receive, pay. I find no agreement between the parties for service without compensation, and no abandonment on the part of Banigan of a claim for some compensation for the current service, but the subject was one to be determined at a future time, when the company was pecuniarily able to determine it. He was serving upon a contract that he should have payment in the future, and his conduct and testimony show that the time and amount of payment were to be contingent upon the time when, and the sum which, the company should be able to pay. In now ascertaining the proper amount, the contract is to control and reference is to be had to the financial ability of the company, as well as to the amount of services, and what would have been the market value under other and different circumstances. The company is now insolvent, and unable to pay its creditors in full. Mr. Banigan actually served from January 13, 1883, to August 9, 1887, except an absence of about three months, and is entitled to compensation for the period of four years and four months at the rate of $2,500 per annum, being $10,833.33.

The claim for $17,550 rests upon a question of law. The contention of the defendant is that, inasmuch as the statutes of Connecticut simply allow a joint-stock company to increase its capital stock, and the articles of association gave no authority to make preferred stock, it was beyond the power of the Hayward Rubber Company to create such a class of stock, and there was a total failure of consideration for the contract; that no estoppel can exist against the assertion of the invalidity of the stock; and that the defendant is entitled to recover the amount paid by him from the corporation. The text-books announce the doctrine that, in the absence of authority in the charter or statutes or articles of association to make a preferred or a special stock, and in the absence of unanimous consent on the part of the stockholders preferred stock cannot be created. Mr. Beach, whose learning on the subject of corporations made any utterance of his on that subject valuable, said, in his treatise on the joint-stock act of Connecticut, (page 25:) "It seems to

be a valid objection to the issue of preferred shares that it impairs the existing equality among the stockholders, but no good reason can be assigned why the articles of association may not lawfully provide for the issuing of such preferred shares, and probably the issue of such shares by the unanimous consent of all the stockholders of an existing company would be held valid." For the purposes of this case I shall assume that, the unanimous consent of all the stockholders not having been affirmatively expressed by vote or by equivalent act, the preferred stock was invalid. If so, the acquiescence of the stockholder cannot give it validity, and he is not estopped from asserting that it is invalid. *Scovill* v. *Thayer*, 105 U. S. 143. If a stockholder could be estopped, Banigan would necessarily be, because he was one of the promoters of the scheme, urged his co-stockholders to buy, voted upon it, and, for the purpose of favorably explaining the company's position to the firm which was to take and negotiate its paper, asserted that it could issue preferred stock, and had done so, to the amount of $25,000.

Notwithstanding the Massachusetts authorities to the contrary, (*Tube-Works* v. *Machine Co.*, 139 Mass. 5, *Reed* v. *Machine Co.*, 141 Mass. 454, 5 N. E. Rep. 852,) I am not favorably impressed with the doctrine that, as against the assignee or receiver of an insolvent corporation, the owner of preferred stock, who has voluntarily subscribed and paid for it for the purpose of promoting the scheme, and has received his certificate therefor, and the terms and conditions upon which the subscription was made have been fully complied with by the corporation, can recover the amount paid. In *Winters* v. *Armstrong*, 37 Fed. Rep. 508, Judge JACKSON guards against such a broad principle, and it is not in accordance with the teaching of *Scovill* v. *Thayer*, *supra*.

If he can recover the amount from the insolvent estate, in a case where there is no claim of an unfulfilled condition, it is upon the theory of a rescission of the contract, because the stockholders had received nothing of value. *Tube-Works* v. *Machine Co.*, *supra; Allen* v. *Herrick*, 15 Gray, 274. This rescission must be made within a reasonable time. In this case Mr. Banigan paid for his stock, April 2, 1885, and was still a stockholder when the receiver was appointed, August 9, 1887. I do not think that the preferred stockholder who voluntarily creates stock of this kind, for this Mr. Banigan virtually did, can hold it for 28 months in the hope of dividends, and then, upon finding the company insolvent, come in as a creditor and receive back his money. Let judgment be entered for the plaintiff for the sum admitted in the stipulation to be due upon the second count, with interest from January 15, 1888, to June 15, 1889; the amount being $26,051.93. The amount admitted to be due upon the first count is $10,494.96, and with interest from December 15, 1887, to June 15, 1889, is $11,439.50. The amount due from the corporation to the defendant for his salary, and a proper set-off against the last-named sum, is $10,833.33, which with interest from August 9, 1887, to June 15, 1889, is $12,033.83. The excess, being $596.33, is a proper claim for a dividend against the insolvent estate.