Argued April 21, affirmed June 2, 1914.

# GRANTS PASS HARDWARE CO. *v.* CALVERT.

### (142 Pac. 569.)

**Pleading—Conclusiveness on Party Pleading.**

1. In a suit by a corporation against former stockholders, where the complaint alleges that the board of directors authorized the transfer of certain property to the defendants, evidence on behalf of plaintiff that the transfer was not so authorized is irrelevant.

**Corporations—Actions—Evidence.**

2. In a suit by a corporation against former stockholders, evidence held not to sustain a charge that defendants claimed that the corporation never paid anything for property transferred by it to them, but to show that the defendants notified purchasers of their stock that the property did not belong to the company, and that, if they bought stock, they would obtain no interest in the property.

   [As to right of corporation or stockholders to maintain suits against officers to call them to an accounting, or set aside their acts, see note in 41 Am. Dec. 367.]

**Corporations—Dividends—Transfer of Property—Evidence.**

3. In a suit by a corporation against former stockholders, evidence *held* to show that a transfer of real property to defendants was a property dividend.

**Corporations—Dividends—Property Dividend.**

4. A corporation can lawfully pay dividends in property.

   [As to the difference between stock and cash dividends, see note, 118 Am. St. Rep. 162.]

**Corporations—Dividends—Declaration.**

5. Where the minutes of a corporation show that its net profits for the three preceding years amounted to a certain sum, a direction that the sum be credited to the stockholders in proportion to the amount of stock owned by them respectively constituted a proper dividend.

**Corporations—Dividends—Stock Dividends.**

6. Where stock is issued to all the stockholders in a corporation with the agreement that they shall not be called upon to pay for it and all the stockholders agree to the contract, the agreement, in the absence of fraud, is binding on the corporation, though not valid as against creditors.

**Corporations—Functions and Dealings—Dealing With Stockholders.**

7. A direction by corporate directors to issue stock to two of the stockholders and charge them with the par value is binding on the corporation.

Corporations—Jurisdiction—Remedy at Law.

8. A corporation has a plain, speedy, and adequate remedy at law against former stockholders for merchandise taken from plaintiff's store which was not charged against them, and a suit in equity therefor cannot be maintained.

From Josephine: FRANK M. CALKINS, Judge.

This is a suit by the Grants Pass Hardware Company, a corporation, against J. L. Calvert and Joseph Wolke. From a decree in favor of defendants, plaintiff appeals. The facts are stated in the opinion of the court.    AFFIRMED.

For appellant there was a brief over the names of *Mr. R. S. Taylor* and *Mr. Asa C. Hough,* with an oral argument by *Mr. Hough.*

For respondents there was a brief and an oral argument by *Mr. H. D. Norton.*

Department 2. MR. JUSTICE RAMSEY delivered the opinion of the court.

On October 18, 1911, J. L. Calvert, one of the defendants herein, as plaintiff therein, commenced an action at law in the court below against the Grants Pass Hardware Company, as defendant therein, to recover the aggregate sum of $4,877.41 from the defendant in said action.

The defendant in said action filed an answer therein alleging that it had no plain, speedy, or adequate remedy at law, and, at the same time, filed in said court a complaint in the nature of a cross-bill, making J. L. Calvert the plaintiff in said action at law and Joseph Wolke defendants, and itself the plaintiff in said cross-bill. The cross-bill alleges, *inter alia,* the commencement of said action at law, and the filing of said answer therein, and that the plaintiff herein is a corporation.

The cross-bill alleges also that, when the plaintiff was incorporated, its capital stock amounted to only $25,000, divided into 250 shares of $100 each, and that it was so incorporated about 1903; that the defendant Joseph Wolke, one of the defendants, became a director of said company in 1903, and remained a director until May 16, 1911, and that the defendant J. L. Calvert became a director of the company in 1904, and remained a director until May 16, 1911.

The cross-bill alleges also that on the 20th day of January, 1908, the capital stock of the plaintiff was increased from $25,000 to $50,000, and that said last-named amount has remained as the amount of the capital stock of said company; that on the 20th day of January, 1907, the total capital stock of said company that had been issued amounted to 172 shares of the par value of $100 each, of which the defendant Joseph Wolke owned 66 shares, and J. L. Calvert, the defendant, owned 56 shares; that the directors of the company at that time were the defendants, Wolke and Calvert, and T. S. Harvey; that the defendants, T. S. Harvey, and one Carlson owned all the capital stock of the defendant then issued.

The cross-bill alleges also that said stockholders fraudulently, and with the intent to appropriate to themselves a portion of the assets of said corporation, and without any authority so to do, directed that said stockholders each be credited upon their personal account with said corporation with certain sums of money, among which are the following: To defendant J. Wolke, the sum of $8,381.31, to defendant J. L. Calvert, the sum of $6,710, and said credits were thereafter made upon the books of the corporation; that upon the same day, and fraudulently and unlawfully, and without any right so to do, the said stockholders did order

certain shares of the unissued capital stock of said corporation to be issued to its said stockholders, among whom were J. Wolke, defendant, 37 shares, and J. L. Calvert. defendant, 36 shares, and the said shares were thereafter issued to said defendants, Wolke and Calvert, without any authority of law so to do, and without any payment having been made for said shares to said corporation, and said corporation has at no time received any compensation whatever for said stock so issued; that said shares were and are of the par value of $100 each.

The cross-bill alleges also, in substance, that on January 20, 1908, the defendants, Wolke and Calvert, and T. S. Harvey were the directors of said corporation, and did on said day, under a resolution of said board of directors, and unlawfully and fraudulently, set apart and appropriate to themselves, and to the other stockholders of said corporation, the sum of $10,000, and ordered that said amount be credited to the personal account of said stockholders in proportion to the number of shares that each held as compared with the total shares that had been issued by said corporation, and thereafter said amounts were credited upon the books of said corporation, to wit, to defendant Calvert $——, and to the defendant Wolke $——; that upon the same day, and fraudulently and unlawfully, and without any authority so to do, the said board of directors ordered certain shares of unissued stock of said corporation to be issued to its said stockholders, and thereafter, in pursuance of such order, without any authority so to do, there was issued to the defendant Wolke 42 shares, and to the defendant Calvert 26 shares, without any payment having been made for said shares to said corporation, and said corporation has at no time received any compensation what-

ever for said stock so issued; that upon the 19th day of
September, 1908, the plaintiff corporation purchased
certain real estate with the improvements thereon, in
the city of Grants Pass, Oregon, described as lots 17
and 18, and the south half of lots 13, 14, 15 and 16 in
block 50 of Grants Pass, and paid for said real estate
from the assets of said corporation; that at the time
of said purchase there was paid in cash by plaintiff the
sum of $3,666.66, and its written obligation given for
the balance of said purchase price, being the sum of
$7,333.34, the total price of said real estate being
$11,000; that on the 10th day of May, 1911, and while
the plaintiff was still the owner of said real estate here-
inbefore described, these defendants, Jos. Wolke and
J. L. Calvert, with the intent to defraud the plaintiff
herein, came before the directors and stockholders of
said corporation, and falsely claimed and stated that
the title to the said real estate was held by said cor-
poration in trust for them, the said defendants herein,
and falsely claimed and stated that said real estate was
no part of the assets of said corporation, and that no
money or property of the corporation had ever been
used as a payment or part payment for said real estate,
and demanded that said real estate be conveyed to
them, claiming that they were the true owners thereof;
that the plaintiff was not at that time informed as to
the truth of said statements, and believed the state-
ments of the defendants in that regard, and did, upon
said day, at the request of the defendants, authorize
its president and secretary to execute a deed to said
real estate of an undivided one-half interest therein to
the defendant J. L. Calvert, and said corporation, by
its president and secretary, relying on said representa-
tions of said defendants, and believing in the truth
thereof, executed and delivered to said J. L. Calvert

said deed for an undivided one half of said real estate, and said corporation did thereafter and upon or about the 19th day of May, 1911, by reason of said false and fraudulent representations made as aforesaid to them by defendants herein, authorize the president and secretary of said corporation to make, execute, and deliver to the defendant Joseph Wolke also a deed for the undivided one half of said real estate; that a deed for the undivided one half of said real estate was thereafter made, executed, and delivered to the said Wolke, and the plaintiff shows that said deeds, as aforesaid, executed to the defendants, were made without any consideration therefor, and with the full belief that the statements made by said J. L. Calvert and the said Joseph Wolke, as hereinbefore set forth, were true.

The plaintiff alleges also, in substance, that after the purchase of said real estate by the defendants, and before the execution of said deeds to the defendants, the defendants made large and various improvements upon said property, and used a large quantity of merchandise, consisting of hardware and building material, said merchandise being the property of the plaintiff herein, of the value of which plaintiff is not informed, but believes to be $2,500, and therefore alleges the same was used in making improvements upon the said real estate, and that no charge of any kind or any account of any kind was kept by plaintiff for said goods, wares, and merchandise, nor was there ever any payment whatever made for the same.

The plaintiff alleges also, in substance, that there has been, during all the times mentioned in the cross-bill, an open account between the plaintiff and the defendants herein, and that the defendants have and each of them has at various times drawn large sums

of money from the plaintiff and defendants, and each of them has drawn the sums of money, so as aforesaid credited to them, and illegally appropriated from the assets of said corporation and the whole thereof.

The bill prays for an accounting, etc.  A demurrer to the cross-bill was overruled.  The defendants answered, denying much of the cross-bill, and setting up a large amount of new matter, including an estoppel, etc.  The reply denied most of the answer.  The trial court rendered a decree, dismissing the cross-bill, etc. The plaintiff appeals.

The evidence is voluminous.  We have read it, but it is impracticable to set it forth.

1. There was some evidence produced by the plaintiff in an attempt to show that the board of directors did not authorize the president and the secretary of the plaintiff to execute to the defendants, Calvert and Wolke, deeds conveying to them the real property referred to in the pleadings and the evidence as the Layton Hotel property.  The minute-book of the company shows that they were authorized to make these deeds; but the plaintiff attempts to impeach these minutes.  All evidence on that point was irrelevant, because the allegations of the cross-bill show that the president and the secretary were authorized by the corporation to execute said deeds.

The sixth paragraph of the cross-bill alleges, in substance, that the defendants, on May 16, 1911, went before the directors and stockholders of the plaintiff and claimed that the title to said real property was held by the company in trust for them, and demanded that the same be conveyed to them, and ''that the plaintiff was not at that time informed as to the truth of said statements, and believed the statements of said defendants in that regard, and did, upon said day, and at

the request of said defendants, authorize its president and secretary to execute a deed to said real estate of an undivided one-half interest therein to the defendant J. L. Calvert." The cross-bill contains a like allegation showing that the corporation did also authorize its president and secretary to execute a deed, conveying an undivided one-half interest in said real property to the defendant Jos. Wolke. The cross-bill alleges also that the president and the secretary did convey a one-half interest in said real property to each of the defendants.

The allegation of the cross-bill is express that the defendants went before the stockholders and the directors of the plaintiff and represented to them that the company was holding said real property in trust for them, and demanded that said real property be conveyed to them, and that the plaintiff did, upon said day, authorize its president and secretary to execute a deed to said real property of an undivided one-half interest therein to the defendant J. L. Calvert, etc. This allegation shows that the president and the secretary were authorized to make said deeds.

1 Ency. of Evidence, page 613, says:

"Such judicial admissions as are made as a substitute for evidence that might be adduced by either side are conclusive for the purposes of the trial and on appeal. *So a party is conclusively bound for the same purposes by an admission in his pleading.*"

In this case, the plaintiff, by its cross-bill, alleges expressly that the president and the secretary *were* authorized by the plaintiff to execute the deeds of conveyance referred to, and this allegation is conclusive upon the plaintiff. The cross-bill expressly alleges that the officers were authorized to execute the deeds, but alleges that this authorization was obtained by

fraud.  Evidence to show fraud is relevant, but evidence tending to show that the board of directors did not authorize the corporation officers to execute the deed is irrelevant.

2, 3. The sixth paragraph of the cross-bill alleges, in substance:

"That the defendants went before the directors and stockholders of the corporation with intent to defraud the plaintiff, and falsely claimed and stated that the title to the real estate [the Layton Hotel property] was held by said corporation in trust for them, * * and falsely claimed and stated that said real estate was no part of the assets of said corporation, and that no money or property of the corporation had ever been used as a payment or part payment for said real estate."

The foregoing extract contains the alleged false claims and statements that the cross-bill alleges were made by the defendants to induce the corporation to execute to them the deeds for said property.

The representations were that the corporation held said property in trust for the defendants, and that said property was no part of the assets of said company, and that no money or property of the corporation had been used as payment or part payment for said real property.  The bill alleges also that no consideration was paid by the defendants for the conveyance of said real property to them.  The answer denies all of said allegations, except that the plaintiff conveyed said premises to the defendant.

J. M. Tetherow, president and a stockholder of the plaintiff, who, as president of the corporation, executed the said deeds to the defendants, as a witness for the plaintiff, testified, in substance, that Wolke never made any statements to obtain a deed for said property, but that Calvert did make statements for that

purpose, and he says that Calvert stated to him that they (Calvert and Wolke) bought the property *with their dividends,* and that it did not cost the corporation a dollar, and that he said that it belonged to him and Wolke; that it had been carried in the name of the corporation, but that the corporation had never paid for it. This witness admits that when he bought stock in the company, quite awhile before the deeds were made, he did not think that he was buying any interest in the said real property, and that he understood when he bought his stock that the real estate did not belong to the company.

W. H. Taylor, a brother in law of Mr. Tetherow, and a stockholder and a director in the corporation, as a witness for the plaintiff, testified that he bought stock in the company about February 7, 1911, before the deeds were made; that when he bought stock in the company he did not understand that he was buying any interest in the Layton Hotel property, and when Calvert was trying to have the deed made Calvert said that the hotel property belonged to him and Wolke, and that the company had no money in it, although it stood in the name of the company.

James A. Smith, a director and stockholder in the company, as a witness for the plaintiff, testifies that he bought stock in the company in April, 1911, before the deeds were made; that when he bought his stock he did not think that he was buying any interest in the Layton Hotel property; that when Calvert was trying to get them to make the deed, he said the hotel property belonged to him and Wolke, and that the company had nothing to do with it.

W. H. Pattillo, a former stockholder, as a witness for the defendants, testifies that before he sold his stock, and before the deeds were made, he told Tethe-

row and Taylor (now directors), when he was trying to sell them his stock, that he reserved his interest in the hotel property and the charged off accounts, and when he transferred his stock to them he said that he reserved his interest in the Layton Hotel. The evidence shows that about May, 1911, Patillo sold his interest in the Layton Hotel property to the defendants for $1,971. Mr. Pattillo says: That when they bought the Layton Hotel property they were to pay for it $11,000. They paid a third down ($3,666.66), and gave a mortgage for the other two thirds. The $3,666.66 was paid with company funds, and the company paid the taxes on it, and received the rents from it. That they carried it about two years. That he and the defendants owned all of the stock in the company. That the three stockholders (he and the defendants) understood each other as one family (Evidence, p. 128). That they decided that the property (the Layton Hotel property) should be deeded to them as their interest showed on the books; but they did not make the deed. When the witness sold his stock he reserved his interest in the hotel property, and later sold it to the defendants.

This witness was bookkeeper for the company, and made the inventory of the company's business for 1910. This was done in January, 1911, but the inventory covered the year 1910. His statements showed a gain for that year of $8,103.56. The directors distributed this $8,103.56 as follows: To Jos. Wolke, by crediting his account, $1,574.67; to J. L. Calvert $1,355.90; to W. H. Pattillo $704.11; to John Tetherow $247.58; surplus $308.40; charged accounts $246.24; real estate (the Layton Hotel property) *charged off* $3,666.66. These items were contained in the statement read by Pattillo at the stockholders' meeting. By

71 Or.—8

the minutes of the meeting of the stockholders, held January 20, 1911, being the one referred to by said witness, it appears that there were present Tetherow, Calvert, Wolke, and Pattillo.   Said minutes state:

"On report of the secretary it was found that the net earnings of the company for the year 1910 was $4,190.66, after *charging off real estate* $3,666.66 (the Layton Hotel property) and bad accounts $246.24, and declaring a dividend of 9 per cent, leaving a surplus of $304.50 to be credited to the surplus fund."

According to the evidence of the witness Pattillo, it was the understanding of the stockholders and the directors that the real estate "charged off" as stated *supra* was to go to him and the defendants as a sort of property dividend.   This witness says (Evidence, pp. 165, 166) that before Tetherow became a stockholder in the company the witness, Calvert, and Wolke (who owned all the stock at that time) talked over the matter of deeding the Layton Hotel property, but that the matter was not attended to then.

The defendant Calvert testifies:

"We had decided before Mr. Tetherow ever bought any of the stock in the concern to deed it (the Layton Hotel property) out."

And he says that by "we" he means Pattillo, Wolke, and himself (all the stockholders at that time), and, continuing, he says:

"Mr. Patillo, you understand that he paid Mr. Harvey for all his stock.   He bought his stock from Mr. Harvey, and Mr. Harvey, owned his stock at the time we bought the hotel, and I didn't understand.   I had it in my mind that Mr. Harvey held some of his stock as security for the payment on it.   You understand, whenever that was straightened up, we would make the deed. * * That was the understanding among the stockholders, * * and we never did that on that account.   That was one of the reasons it never had been

deeded before Mr. Tetherow ever bought any stock in the concern. Then, after Mr. Tetherow had bought an interest in the concern, we said we would leave it until the annual meeting of the stockholders, and, at the annual meeting of the stockholders, it was bought up and decided to *charge off the real estate* with the amount of the purchase price. * * The action taken was it was understood to be charged off as an asset of the company, and the dividend was to be declared on the balance after that was charged off, the bad accounts.''

Without reviewing the evidence further on this point, we will say that the evidence shows that the stockholders of the company, up to May, 1911, seemed to run the business of the company much like a partnership is frequently conducted. For a time Wolke, Calvert, and Pattillo, owned all the stock and were the directors and other officers of the company, and they were all engaged in conducting the business, and each of them knew what was being done.

In September, 1908, the company purchased the Layton Hotel property for $11,000, and paid $3,666.66 down on the purchase price, and gave a mortgage on the property purchased for the remainder. When they bought it they intended to use it as a business house in which to conduct the company's business; but later they changed their minds, and rented another building as a place in which to carry on the business, and they did not use the hotel property. They rented it, and the company paid taxes on it and received the rents. The company had no use for the property, and never paid the mortgage upon it, and prior to January, 1911, Wolke, Calvert, and Pattillo, then owning all the stock in the company, decided that they would set this property apart as a property dividend to themselves, and have a proper conveyance of it made. They owned all of the stock, and were the

officers of the company. The company appears to have been in a good financial condition. Creditors were not affected. All of the stockholders and the directors appear to have agreed that said property should be so disposed of. When they had their annual stockholders' meeting in January, 1911, the secretary made a report, and a dividend was declared, and the Layton Hotel property, valued at $3,666.66, was *"charged off"* .from the assets of the company, with the understanding that it should be conveyed to Pattillo, and the defendants. Pattillo sold his interest to the defendants. Tetherow, Taylor, and Smith purchased the stock of the company, but before any purchase was made by either of them, he was notified that the Layton Hotel property did not belong to the company, and that by purchasing stock, the purchaser would obtain no interest in said property. Each was told that this property belonged to the defendants or to Pattillo and the defendants. Each of the new stockholders bought their stock with notice and the understanding that the hotel property did not belong to the company, and that it did belong to the defendants or the defendants and Pattillo, who constituted *all* the stockholders of. the company before the new stockholders bought their stock.

On May 16, 1911, when Tetherow and the other new stockholders had become members and officers of the company, the defendant Calvert asked the directors of the company to make to him and Wolke deeds conveying to them the hotel property. As shown *supra,* the board passed resolutions authorizing and directing the president and the secretary of the company to convey by deed to the defendant Calvert, an undivided one half of said property, and to the defendant Wolke the other one half, and these conveyances were exe-

cuted. The defendants have paid the mortgage on said property, amounting to $7,333.34, and interest, and have made improvements thereon costing between $3,000 and $4,000, and hence they have invested in said property about $11,000.

The plaintiff is not an insolvent corporation, and, this suit was not instituted by a creditor of the company, the company itself brings this suit, and charges that said deeds of conveyance were obtained by fraud, and the fraud alleged by the cross-bill is that the defendants represented to the directors and stockholders of the plaintiff, for the purpose of obtaining said deeds:

"That the title to said real estate was held by said corporation in trust for them, * * and falsely claimed that said real estate was no part of the assets of said corporation, and that no money or property of the corporation had ever been used as a payment or part payment for said real estate."

The president of the plaintiff, to substantiate the charge of fraud, testified that the defendant Calvert, when he asked the board to make said deeds, said:

"Well, he said they paid for it with their dividends, and it hadn't never cost the corporation anything."

The defendants deny the charge of fraud. The court below found that the defendants were not guilty of any fraud.

While the evidence is conflicting as to whether the defendants claimed that the corporation never paid anything for said property, we find that said charge is not sustained by a preponderance of the evidence. The defendants and Pattillo notified Tetherow, Taylor, and Smith, before either of them bought any stock in the company, that the Layton Hotel property did not belong to the company, and that, if they bought

stock in the company, they would thereby obtain no interest in said property, and each of said persons admits that he was so notified, and that when he bought his stock he understood that said property belonged to the defendants and Pattillo. The defendants claim that said property was "charged off" the assets of the company and to be conveyed to them as a property dividend.

We think that the officers of the plaintiff, when they authorized the making of said deeds, and when the deeds were executed, had knowledge and notice that said property had been set apart as a dividend to be conveyed to the defendants, and that they made said deeds to carry out the said arrangement according to the intention formed by the company when the defendants and Pattillo were the directors and sole stockholders thereof.

We hold that the transfer of said hotel property to the defendants was, in effect, the payment of a dividend in property in accordance with the previous action and intention of the company. While the proceedings relating thereto, prior to the execution of the deeds, were not very formal, yet the evidence shows what the intention was, and the execution of the deeds carried out that intention fully.

4. Clark & Marshall, Private Corporations, Section 523, relating to the manner of paying dividends, says *inter alia:*

"Unless otherwise provided, it is within the discretion of the directors of a corporation to pay dividends either in cash, *or property or bonds,* or if there is stock in reserve or the capital stock may be increased *in stock,* but if a dividend be made payable in cash or generally, the debt must be paid in lawful currency."

The corporation could lawfully pay dividends in property. The dividend thus paid amounted in value

to $3,666.66, and it was paid to Calvert and Wolke, and included what was owing Pattillo, who had conveyed his interest to them.

5. The fourth paragraph of the cross-bill charges that the stockholders of the plaintiff, on January 20, 1907, unlawfully, fraudulently, and without authority, and with intent to appropriate to themselves a portion of the assets of the corporation, directed that said stockholders each be credited upon their personal account with said corporation with certain sums of money, among which are the following: To the defendant J. Wolke the sum of $8,381.31; to the defendant J. L. Calvert, the sum of $6,710.

The minutes of said corporation, under date of January 20, 1907, show that their net profits for the three preceding years amounted to $19,302.51. The corporation directed that said sum be credited on the books of the company to its stockholders in proportion to the amount of stock by them respectively owned. This was done, and constituted a dividend. Each stockholder received his proper part and assented to the distribution so made. We see no good grounds for objecting thereto.

6. The cross-bill also charges that on the 20th day of January, 1907, the stockholders ordered issued to the stockholders of said company certain shares of the unissued capital stock of said company, among whom were J. Wolke, defendant, 37 shares, and J. L. Calvert, defendant, 36 shares; and that said shares were issued, and the cross-bill alleges that the ordering of the issuance of said stock and its issuance were illegal, fraudulent, and without authority, and it alleges that nothing has been paid to the company for said stock. It did not state *why* this issuance of said stock was

fraudulent or unlawful or without authority, except that nothing was paid for it.

At the time stated *supra* the stockholders directed also that 15 shares of stock be issued to O. P. Harvey and 10 shares to T. S. Harvey, both stockholders of the plaintiff. The minutes of the stockholders' meeting at which the issuance of said stock was directed show that it was ordered also that the accounts of said stockholders to whom stock was directed to be issued be *charged* with the amount of stock so to be issued to them at the par value thereof. This indicates that the stockholders were expected *to pay for the stock so issued.*

At the said meeting *all* the stockholders were present and apparently all agreed to the proceedings then had. The minutes show no opposition to anything that was done. We assume, therefore, that said stock was directed to be issued with the assent of all of the stockholders. This is not a proceeding by creditors; but it is a suit by the company itself against former stockholders.

If stock were issued as paid-up stock, when it was not paid for, or gratuitously with the consent of all the stockholders of the company, the company could not subsequently repudiate the declaration and agreement, when no actual fraud entered into the transaction, and collect either from the person receiving the stock or his transferee pay for the stock, as the company would be estopped from doing so.

2 Clark & Marshall, Private Corporations, Section 395, *inter alia,* says:

"It is undoubtedly true, however, as was stated in a former section, that when a corporation issues watered or fictitiously paid-up stock, with the consent of all the stockholders, and when there is no charter, statutory, or constitutional provision rendering the

transaction void, the agreement is valid and binding *as against the corporation,* and it cannot afterward repudiate the same and exclude the holders of the stock, or compel them to pay the difference between the par value of the stock and what has been paid or agreed upon as full payment. This is true whether the stock was issued for cash or property at a discount, or for property taken at an overvaluation *or gratuitously.*"

In *Christensen* v. *Eno,* 106 N. Y. 99 (12 N. E. 648, 60 Am. Rep. 429), the court says:

"It is very plain, upon the facts, that the plaintiff in asserting this claim cannot stand upon any right existing in the corporation itself to proceed against the defendant Eno. The transactions by which he acquired the shares as paid up * * to the extent of 40 per cent of their nominal amount, and received the bonds, created no obligation as between him and the company to pay the amount unpaid on the stock or to account to the company for the bonds or their proceeds. As between Eno and the company, it was not intended that the former should be accountable to the company for the amount unpaid on the stock or for the bonds. Viewing the transactions in the light most favorable to the plaintiff the credit on the stock and the transfer of the bonds were intended *as a gratuity* to the stockholders who had been called upon to pay calls upon their original subscriptions in excess of what was expected and of what was represented would be necessary at the commencement of the enterprise. There can be no doubt but that, *as between the corporation and its stockholders,* these transactions were binding according to the actual intention. The corporation itself would have no standing to demand that * * Eno should pay the 40 per cent on the stock which it acknowledged had been paid, or that he should account for the proceeds of the bonds. The claim of the plaintiff, therefore, must be maintained, if at all, not in the right of the corporation, or by way of equitable subrogation to any right of the corporation against Eno, but in hostility to the arrangement between them,

under which he received the stock and the bonds":
See, also, 2 Clark & Marshall, Private Corporations,
§ 389.

10 Cyc. 467, says:

"As between the corporation and the subscriber the
question is not generally treated as one of public
policy; and hence, as between the sharetaker and the
corporation, an agreement whereby shares are to be
taken by him at less than their par value, at a dis-
count, as unassessable, or on payment in property or
any other commodity at an overvaluation, is valid, *al-
though not binding upon its creditors.*"

26 Am. & Eng. Ency. L. (2 ed.), 842, says:

"The truth is that the issue of stock *without con-
sideration,* or for an inadequate consideration, may
be impeached as between some parties and under some
circumstances, while as between other parties and
under other circumstances the transaction cannot be
impeached. At common law and in the absence of
statute, watered stock is valid and imposes no liability
*as between the corporation and the stockholders* to
whom it is issued, and this rule has been applied even
under statutes which prohibit the issue of stock for
less than par."

In *Scoville* v. *Thayer,* 105 U. S. 153 (26 L. Ed. 968),
the court, *inter alia,* says:

"The stock held by the defendant was evidenced by
certificates of full paid shares. It is conceded to have
been the contract between him and the company that
he should never be called upon to pay any further
assessments upon it. The same contract was made
with all the other shareholders, and that fact was
known to all. *As between them and the company, this
was a perfectly valid agreement.* It was not forbidden
by the charter or by any law or public policy, and, as
between the company and the stockholders, was just as
binding as if it had been expressly authorized by the
charter."

In the same case, on page 154 of the same volume, the court states the rule as applied between shareholders and creditors thus:

"But the doctrine of this court is that such a contract, though binding on the company, is a fraud in law on its creditors, which they can set aside; that when their rights intervene and their claims are to be satisfied, the stockholders can be required to pay their stock in full."

If this stock was issued to all the stockholders with the agreement that they should not be called upon to pay for it, and all the stockholders agreed to such contract, the agreement, in the absence of fraud, is binding upon the corporation; but such an agreement would not be valid as against the creditors of the company.

7. The plaintiff contends also that on the 20th day of January, 1908, the board of directors of the plaintiff was composed of the defendants and T. S. Harvey, and that upon that day, under a resolution of said board, the said board unlawfully and fraudulently set apart and appropriated to themselves and to the other stockholders of said corporation the sum of $10,000, and ordered said sum to be credited to the personal accounts of said stockholders in proportion to the number of shares that had been issued by said corporation, and that said amounts were so credited. The plaintiff contends also that at the same time said board unlawfully and fraudulently ordered certain shares of the unissued stock of the plaintiff to be issued to its said stockholders, and thereafter, in pursuance of said order, there was issued to the defendant Wolke 42 shares and to the defendant Calvert 26 shares of said stock, and that the plaintiff has not received anything for said stock.

The annual meeting of the stockholders of the plaintiff occurred on January 20, 1908, and the board of

directors met on the same day immediately after the meeting of the stockholders. At the meeting of the board it was shown that the net profits of the business for the year 1907 had been $10,000. At said board meeting it was unanimously ordered that the account of J. Wolke be charged with $4,200, and that 42 shares of stock of the company be issued to him; that the account of J. L. Calvert be charged with $2,600, and 26 shares of the stock be issued to him. The said shares were issued to Wolke and Calvert, and their respective accounts with the company were *charged* with said amounts, which were the value of the stock so issued to them, at par. The company charged them with the par value of the stock so issued to them. The board then distributed said $10,000 of net profits to the stockholders of the company in proportion to the amount of stock owned by them respectively. We think that the issuance of said stock to Wolke and Calvert was valid. The company charged them with the par value thereof. The distribution of the $10,000 of net profits among the stockholders was a dividend, and it was valid.

8. It is claimed that the defendants obtained from the plaintiff's store merchandise that was not charged against them, and for which they have not paid. If this is so, the plaintiff has a plain, speedy, and adequate remedy therefor at law.

We have examined the various matters presented by the appeal, but we find no error in the decree of the court below.

The decree of the court below is affirmed.

AFFIRMED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE BEAN and MR. JUSTICE EAKIN concur.